In re FIRST SOFTWARE CORP., Debtor.

David J. FERRARI, Disbursing Agent, Plaintiff,

v.

COMPUTER ASSOCIATES INTERNATIONAL, INC., Defendant.

Bankruptcy No. 86–10560–JNG.
Adv. No. 86–1114–JNG.

United States Bankruptcy Court, D. Massachusetts.

March 15, 1988.

Douglas G. Moxham, Hale and Dorr, Boston, Mass., for plaintiff.

James D. McGinley, Gaston Snow & Ely Bartlett, Boston, Mass., for defendant.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

### INTRODUCTION

The matter before the Court is the adversary complaint commenced by First Software Corporation ("First Software" or the "Debtor") on May 20, 1986 against Computer Associates International, Inc. ("Computer Associates"). The prosecution of the adversary complaint passed from the Debtor to David J. Ferrari, the Disbursing Agent appointed pursuant to First Software's plan of reorganization, which was confirmed on February 19, 1987.

The complaint contains four counts through which the Disbursing Agent seeks the recovery of preferential payments and transfers of property made by the Debtor to Computer Associates within the 90 days preceding the Debtor's April 19, 1986 filing. Count I refers to a transfer on March 21, 1986 of property having a value of $1,030.[1] Count II refers to a transfer on March 25, 1986 of property having an alleged value of approximately $1.5 million. Counts III and IV refer to payments made on March 25, 1986 and April 2, 1986 by certified checks in the amounts of $200,000 and $250,000, respectively.

### FACTS

First Software was a distributor of Computer Associates' software until April of 1986. In December of 1985, it was in arrears on its account with Computer Associates. Abraham Poznanski ("Poznanski"), the president of Computer Associates' Mi-

---

1. The Court notes that First Software waived Count I by failing to argue its merits, or even mention it, in its post-trial brief or oral argument.

cro Products Division, was concerned about collection problems, particularly since he had just been appointed to his position in October of 1985. He testified that at the end of 1985 First Software owed Computer Associates between $800,000 and $1,000,000, an obligation stemming from an $800,000 sale in August of 1985 and still older accounts.

In early December 1985, First Software advised Computer Associates, in a letter dated December 4, 1985,[2] that it had received "formal credit committee approval for a $25 million financing accomodation from Heller Financial Inc." and that, as a condition of consummation of Heller's financing arrangements with First Software, Heller required vendors, such as Computer Associates, to *inter alia* acknowledge and agree to Heller's senior lien and security interest in any inventory in which the vendor also might have a security interest, lien, right or claim. Computer Associates endorsed the December 4, 1985 letter agreement but, in an accompanying response and a follow up letter, outlined conditions of its own, "namely, that First Software would pay to us by no later than December 13, 1985 approximately $400,000 of its outstanding balance owed to us, and that the remaining amount of that balance would be paid to us on or before January 4, 1986."

Although First Software did not comply with these conditions, it did pay Computer Associates by check dated January 6, 1986 $587,979.07 toward its outstanding balance. Additionally, in mid-January, two First Software representatives, Michael Hajjar ("Hajjar"), who was the Debtor's president at the time and the person primarily responsible for purchasing, and Michael Kirwin ("Kirwin"), the Debtor's chief financial officer, traveled to California to meet with Poznansky and other Computer Associates' personnel to discuss the purchase of additional products by First Software. By let-

ter dated January 17, 1986, Computer Associates confirmed the agreement reached between the parties in California for the purchase of $2 million worth of software. The agreement set forth the following payment schedule:

| | | |
|---|---|---|
| February 15 | — | $750,000 |
| February 22 | — | $250,000 |
| April 15 | — | $750,000 |
| April 22 | — | $250,000 |

First Software was unable to adhere to the schedule and did not make the first payment on time. Shortly after February 15, 1986, Poznansky contacted Kirwin and was told that First Software had not received all the promised inventory. Consequently, Poznansky agreed to a deferral of the first payment until February 28, 1986. Poznansky called Kirwin again on or around that date because Computer Associates had not received the payment then due. By that time, Poznansky had ascertained that all the products ordered by First Software had been shipped.

As a result of First Software's failure to abide by the payment terms outlined in the January 17, 1986 letter, Poznansky initiated a telephone campaign to obtain payment. He testified that he repeatedly called Mike Kirwin. Indeed, he admitted that by the end of March he was exasperated with the principals of First Software and the excuses they advanced for First Software's inability or unwillingness to pay Computer Associates. Although the testimony of Poznansky and Rick Faulk ("Faulk"), the Debtor's former chief executive officer and current president,[3] is somewhat contradictory, it is readily apparent that exchanges between Poznansky and the principals of First Software were heated. For example, during one conference call, Poznansky, on the one hand, testified that:

> Faulk took the lead. He was basically shouting and beat me up and I didn't have much to say. He made several accusations about why they couldn't pay

---

2. The December 4, 1985 letter was addressed to Don Hoffman who was the financial vice-president of Sorcim/IUS, another division of Computer Associates, which like the Micro Products Division is located in San Jose, California.

3. The Court notes that Michael Kirwin, Michael Hajjar and Rick Faulk were co-founders of First Software Corp. Kirwin and Hajjar are no longer employed by the reorganized Debtor. Faulk assumed the role of president upon the filing of the bankruptcy petition.

us, including the fact that we hadn't really—the product wasn't really selling—and we hadn't really lived up to the commitments we made.

Faulk, on the other hand, recounted threats made by Computer Associates' executives to sue First Software, to go to the trade press with revelations about First Software's dire financial condition and to commence an involuntary bankruptcy proceeding.

In response to mounting pressure by Computer Associates, Kirwin offered to make a number of installment payments of $50,000 each. Poznansky, however, was not satisfied. Finally, the parties agreed that First Software would pay $450,000 to Computer Associates on the outstanding obligation and that First Software would return approximately $1,500,000 of Computer Associates' products in its inventory. Poznansky agreed to accept the return and the $450,000, provided the payment was made by certified check.

On March 21, 1986, a Friday, Computer Associates arranged for a truck to be at First Software's warehouse to pick up the inventory. However, First Software personnel sent the truck away. Upon being so advised, Poznansky admitted that he called First Software and threatened a law suit. The following Tuesday, First Software returned products to Computer Associates that First Software valued at $1,500,026. First Software also delivered a certified check to Computer Associates in the amount of $200,000. Shortly thereafter, on April 2, 1986, First Software delivered another certified check to Computer Associates in the amount of $250,000. Computer Associates segregated the products returned by First Software and, except for a retender of the products to First Software on May 24, 1986, it has made no attempt to sell or dispose of the products. Poznanski testified that Computer Associates could have sold the returned products in April of 1986.

Less than three weeks after the delivery of the second certified check, First Software filed its Chapter 11 petition. In mid-May, it commenced the instant adversary proceeding. By letter dated May 24, 1986, counsel to Computer Associates, in response to the filing of the instant preference complaint, formally tendered the return of any and all goods that were recovered by Computer Associates. However, counsel also advised First Software that Computer Associates would seek "a judicial determination that these goods, upon their re-delivery to you, are and/or should be subject to restraint against sale at liquidation or at below market prices." Parenthetically, at about the same time the Debtor filed this adversary complaint against Computer Associates, it sent notice to counsel to the creditors' committee and parties who filed a request for notices that it proposed to sell to Fortune 1000 Distributors of Sausalito, California certain Sorcim/IUS (Computer Associates) software for 75% of the Debtor's cost or $136,782.84. Computer Associates objected to this sale, but its objection was overruled by the Court.

Counsel to the Debtor responded to the Computer Associates' offer to return the goods recovered by letter dated May 29, 1986. In rejecting the offer, Debtor's counsel stated:

We are advised that those goods can be sold in the ordinary course with normal marks-ups; however, it also appears that the quantities involved are far above the stocking level management would consider reasonable should First Software handle these products. More important, management believes that it cannot profitably handle these products on a one-shot basis. In light of the events of the past few months, it appears impossible to salvage a constructive on-going relationship.

With respect to the value of the product returned by First Software, Faulk testified that First Software could have sold the software at normal mark-ups of 8–10% over its cost in March of 1986. Additionally, Computer Associates, as evidenced by its credit memorandum dated March 28, 1986, agreed to credit First Software's account in the amount of $1,500,026. Despite the credit memorandum, Poznanski testified that the value of the returned product to

Computer Associates was approximately 10% of the invoice price or approximately $150,000.

First Software in answers to interrogatories indicated that the value of the returned product as of May 26, 1986 was 50–75% of invoice amounts. First Software attributed the decline in value to the releases of upgraded versions of two of Computer Associates' most popular software products, Easy Business Systems and Supercalc III 2.1. Gordon Berry ("Berry"), the Debtor's former product acquisition manager, testified about the effect of an announcement of a new version of software on First Software's ability to sell the old version. He stated:

> It would depend upon the timing of the announcement, but usually what happened was whatever inventory you had on hand at the time became null and void, the retailers wanted the most recent version because that's what their customers wanted. So it was very difficult, once an announcement was made ... to continue to sell at ... large volumes....

Berry, as well as Poznansky, explained that vendors such as Computer Associates adopted marketing programs whereby old product versions could be exchanged for new ones. Specifically, Poznansky indicated that three marketing programs were available to enable users to obtain upgraded products and to indirectly help distributors clear old versions of products from their inventories. However, in May of 1986, First Software was no longer a distributor of Computer Associates' products and could not have benefitted directly or indirectly from the programs identified by Poznansky.

Poznansky addressed the decline in the value of the products returned by First Software in his testimony. Referring to the Returned Material Report identified by Faulk, he noted that Supercalc III 2.1, which was replaced by Supercalc IV, constituted only a small portion of the units

returned, i.e. 1,000 out of 7,147 units returned or $158,000 out of $1,500,026 worth of products returned.[4] Despite this attempt to show that the returned products had not declined in value as much as First Software argues they had, it is clear that new releases came on the market in May and June of 1986 and affected the salability of the products.

With respect to the liquidation analysis required by section 547 of the Bankruptcy Code, 11 U.S.C. § 547, the Disbursing Agent testified that, as of September 15, 1986, the dividend payable to Computer Associates on its claim upon liquidation would have been 20.45%. This analysis was predicated on the assumption that preferential payments and transfers of products were brought back into the Debtor's estate to be counted along with other assets and that Computer Associates' proof of claim for $743,559 would be increased by the amount of the two checks and the value of the products returned, i.e., approximately $1,950,000.

On cross examination, Ferrari admitted that there may have been more available for creditors on the filing date than on September 15, 1986. Indeed, based upon an analysis of the Debtor's unaudited balance sheet dated March 31, 1986 Ferrari admitted that the Debtor's assets totaled approximately $18 million and its unsecured debts $21–22 million, yielding a dividend of 81–87% nineteen days before the filing, assuming the return of the alleged preferences by Computer Associates.

## DISCUSSION

### I.

■ Section 547(b) of the Bankruptcy Code permits a trustee to avoid a transfer of property as a preference if the transfer (1) was "to or for the benefit of a creditor"; (2) was "for or on account of an antecedent debt;" (3) was "made while the debtor was insolvent;" (4) was made on or within 90 days before the debtor filed its bankruptcy

---

**4.** The Court's numbers come from plaintiff's Exhibit 5, the Returned Material Report. The Court is unable to follow the reference in Computer Associates post-trial brief to 8,246 programs returned and a total price of $1,487,818.

petition; and (5) enabled the creditor to receive more than the creditor would have received if the debtor had not made the transfer. 11 U.S.C. § 547(b). Congress' intent in enacting section 547(b) was to promote equal distribution among a bankrupt's creditors. *See* H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 178, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6138. *See also In re Energy Cooperative, Inc.*, 832 F.2d 997, 1002 (7th Cir.1987).

There are no disputed factual issues with respect to the first four elements of section 547(b) for the three transfers in question. Moreover, with respect to the two payments made to Computer Associates by certified check, the fifth element is not in dispute either.

Computer Associates has advanced an ingenious argument, albeit a legally untenable one in this Court's view, with respect to the fifth element necessary to establish a preference for the product return. That subsection provides in relevant part: "the trustee may avoid any transfer of an interest of the debtor in property—(5) that *enables such creditor to receive more* than such creditor would receive if—(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title." 11 U.S.C. § 547(b)(5) (West 1987). Computer Associates' argument is two pronged. In the first place, it maintains, based in-part on the emphasized language above, that the value of the products returned must be measured not by the invoice price or the amount credited to First Software's account pursuant to the credit memorandum, but by the value of the returned products to it. In other words, Computer Associates asserts that for purposes of section 547(b) the relevant value of the product is its cost, i.e., one-tenth of the sales price or approximately $150,000.

Computer Associates, while recognizing that no authority exists construing the language "enables such creditor to receive more", states that the product return did not give it the means, power or opportunity[5] to obtain $1.5 million by reselling the product through ordinary distribution channels since it had that ability both before and after the product return. It says that what the product return did do was to enable it to avoid the cost of "rerunning" the returned programs, the value of which was 10% of the invoice price.

The Court is unpersuaded by the reasoning advanced by Computer Associates. Contrary to Computer Associates' position that there was no agreed value shown on the facts presented, the Court finds that the credit memorandum is dispositive of the valuation issue. Any alternative finding would defy common sense and defeat the purpose of promoting equal distribution among creditors. Moreover, as First Software correctly recognizes, if the product had not been returned, Computer Associates undoubtedly would have filed a proof of claim based on the invoice amount.

Computer Associates relies upon *Levy v. Rendle Contracting & Dock Building Co.*, 9 F.Supp. 1009 (D.Mass.1935) for the proposition that the value of the preference should be determined from the preference defendant's perspective. In that case, the trustee sought to recover a preference resulting from the transfer of personal property including three boats. The bankrupt corporation had received an offer to purchase the three boats for $5,000 and, upon the completion of the transfer, the defendant credited the bankrupt's account for $5,100. Shortly after the adjudication, the defendant offered to return the boats to the bankrupt. Significantly, the parties stipulated that the value of the boats at the time of transfer was only $2,000. On appeal, the defendant questioned the amount of money the trustee was entitled to recover, i.e., $2,000 or $5,100. The defendant also questioned the trustee's right to a money judgment in the first instance. The court held that the trustee had the right to

---

**5.** Computer Associates cites Black's Law Dictionary and Webster's New Collegiate Dictionary for the definition of "enable," i.e., "to give pow-er to do something" or "to provide with the means or opportunity."

elect whether to sue for the return of the property or its value. The court then proceeded to address the plaintiff's contention that the transfer should be treated as if the defendant had paid to the bankrupt $5,100 and the bankrupt had immediately paid that sum in cash to the defendant. The court criticized the trustee's contention, stating:

> Money paid on account is deemed to be a transfer of property within the scope of the statute but, I take it, that does not warrant the conclusion that a transfer of tangible property must be deemed a payment of money. It is the transfer that is open to attack under section 60b....
>
>     *     *     *     *     *     *
>
> In most cases of transfer of property in part satisfaction of pre-existing indebtedness, the indebtedness is reduced by some definite amount. To hold that an amount recoverable is the amount credited would enable creditors to defeat the purposes of section 60 of the act. (11 USCA § 96). If *Stearns Salt & Lumber Co. v. Hammond* (C.C.A.) 217 F. 559, cited by the plaintiff, means more than that the purchase price may in some instances be accepted as the agreed value, I am unable to follow it. When, for the purposes of the trial of a law action brought to recover a preference, *the parties have agreed upon the value of the property at the time of the transfer,* that value must control.
>
>     *     *     *     *     *     *
>
> This conclusion is compatible with the purposes of the statute. The preference depleted the estate only to the extent of the fair value of the property transferred, and if the depletion is made good the creditors lose nothing by the transaction.

*Id.* at 1010 (emphasis supplied) (citations omitted).

Clearly, parallels exist between the instant case and *Levy.* However, one key difference is obvious: the trustee and the defendant in the *Levy* case had stipulated to the value of the transferred property. Here, instead of a stipulation, there is controversy. As a consequence, the Court must look to the evidence on the record.

The Court is persuaded by the credit memorandum and the testimony of Faulk and Poznansky. Indeed, Poznansky unequivocally stated that Computer Associates could have resold the products soon after their return. It is axiomatic that what a willing buyer will pay a willing seller is the absolute best indication of fair market value. The $1.5 million sales price is, in this Court's view, a more reliable gauge of the products' value than Computer Associates' manufacturing cost, a figure that incidentally omits the important costs associated with the development and marketing of software products. However, the Court does note that the products were purchased on January 15, 1986, returned on March 25, 1986, and had declined in value by 50–75% by May 26, 1986. In view of the credit memorandum, however, the Court finds that the returned products retained a value of $1.5 million on March 25, 1986, since the product revisions regardless of the extent to which they later affected the overall value of the products were not announced until after that date.

The Court finds some support for its determination in *In re Computer Universe, Inc.,* 58 B.R. 28 (Bankr.M.D.Fla. 1986), a case cited by First Software to sustain its position. In that case, the preference defendant had received computer equipment worth $38,393 in exchange for the cancellation of an outstanding obligation in that amount for accounting services. The court noted that the defendant

> suggested that the measure of damages should be limited to the cost to the debtor of the equipment. Such recovery would be insufficient. The testimony at trial was that this figure did not include the sales commission that was paid, freight, or indirect selling and overhead expenses. The defendant is bound by its agreed valuation.

*Id.* at 32. *See also Matter of Ralph A. Veon, Inc.,* 17 B.R. 590, 592 (Bankr.W.D. Pa.1982).

The second prong of Computer Associates argument with respect to section 547(b)(5) is that the Disbursing Agent failed to sustain his burden of proof with

respect to both what the value of the returned product was on March 25, 1986 and what Computer Associates would have received if the company had been liquidated. Computer Associates correctly notes that the Disbursing Agent used the wrong date to compute the dividend in a hypothetical liquidation, since it is beyond dispute that the proper method of computation under section 547(b)(5)(C) is to do a liquidation analysis at the date of the filing less only administrative expenses. *In re Tenna Corp.*, 801 F.2d 819 (6th Cir.1986). On the basis of the March 31, 1986 unaudited financial statements, Computer Associates determined that the dividend to unsecured creditors would be between 81–87%. Accordingly, Computer Associates maintains that using the legally correct date would yield a verdict in its favor, assuming the products are valued at $150,000. The Court does not agree.

Perhaps the clearest statement of the analysis required under section 547(b)(5) is set forth by former Bankruptcy Judge William L. Norton.

Under this provision, a two-part analysis is required. First, one must determine what the creditor receives if the transfer remains valid. Second, one must determine what the creditor would have received in a liquidation case if the transfer had not been made.

This two-point test suggests that some transfers will be sufficiently small that they would not exceed the expected return in a liquidation case and would, therefore, not improve the creditor's position. This analysis misconstrues the nature of the test. In fact, the first element of the comparison requires not only a computation of the value of the transfer, but a compilation of the value of the transfer plus the amount that will nevertheless be received from the estate.... The following illustration suggests the appropriate comparison: assume that C has a $5,000 claim and that the estate will pay 10¢ per dollar. C receives a $1,000 payment. If the payment is not avoided, C receives $1,000 plus $400 from the estate. If the transfer had not occurred, C would receive

$500. Thus, in this case, the transfer had the requisite preferential effect.

Given the nature of the test, virtually any transfer to a general, unsecured creditor will have a preferential effect. 2 W. Norton, Norton Bankruptcy Law and Practice § 32.09 (1981 & Supp.1987).

It is clear that whether the dividend upon a hypothetical liquidation is calculated to be 20% or 85% Computer Associates received a preference when the goods were returned to it on March 25, 1986. Computer Associates has filed a proof of claim in this proceeding for approximately, $744,000. By adding to that proof of claim the payments received by Computer Associates during the preference period, it can be readily established that Computer Associates has a total claim of approximately $2.69 million. During the preference period it was paid $1.95 million on its $2.69 million claim. If those payments were allowed to stand Computer Associates would receive $1.95 million plus $632,400 on its proof of claim (.85 × $744,000), assuming an 85% dividend, for a total payment of $2.58 million. If Computer Associates received 85% of its total claim of $2.69 million, it would receive $2.29 million instead.

With respect to the value of the product returned on March 25, 1986, the Court reiterates its finding that the goods had a value of $1.5 million on March 25th. Computer Associates responded to the evidence of value, namely the credit memorandum amount and the testimony of Faulk, with the testimony of Poznansky. Although it is clear that the goods declined in value significantly by May 24, 1986 when Computer Associates tendered them to First Software, the Court finds that the burden was on Computer Associates to rebut the testimony offered by First Software as to the value of the product on March 25, 1986 with more than Poznanski's assertion that the value of the products to Computer Associates were approximately 10% of the invoice price. Moreover, the Court emphasizes Poznanski's admission that Computer Associates could have resold the products for $1.5 million when they were returned by First Software.

■ Section 550 of the Bankruptcy Code provides in relevant part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover for the benefit of the estate, *the property transferred, or, if the court so orders, the value of the property,* from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made.

11 U.S.C. § 550 (West 1987) (emphasis supplied). With respect to the product returned on March 25, 1986, Computer Associates maintains that, if a preference is found, the Court should order the return of the product to First Software. It asserts that the Court should only issue a judgment for value where the product itself has declined in value because of its use, improper storage or other improper conduct of the preference defendant. Also, it asserts, notably without reference to any legal authority, that where there has been a retender, the Court may not order a recovery of value. Moreover, Computer Associates insists, in the face of Faulk's testimony and the credit memorandum, that the Disbursing Agent has "left a hole in this case of insurmountable proportions" with respect to the value of returned product on March 25th.

■ In the instant proceeding, the evidence showed a significant decline in the value of the returned inventory between March 25, 1986 and May 24, 1986. As a consequence, the Court is unable to conclude that First Software had a duty to accept the retendered goods or that the retender on May 24, 1986 would have made First Software whole. Moreover, on March 25, 1986, as First Software properly notes, there was nothing preventing Computer Associates for reselling the returned products for the amount invoiced by First Software. If Computer Associates had sold the products it could have realized $1.5 million. It would be unwarranted at this point in time to order the return of the products to First Software since the products had depreciated in value by May 24, 1986 and today are presumably close to worthless in

view of on-going product revisions and improvements. As the court in *In re Computer Universe, Inc.*, 58 B.R. 28 (Bank.M.D.Fla.1986), stated:

Return of the property would be inappropriate in this instance. The defendant has been using the property for over a year.... [T]he defendant cannot seriously argue that personal property of this sort does not depreciate in value. The plaintiff cannot be made whole by the return of used computer equipment any more than by the return of an automobile that was transferred new but used for a year. If the property were still worth its original value, the defendant could sell it and satisfy a money judgment; if not, the defendant has been enriched at the expense of the estate. Any relief other than entry of a money judgment would encourage transferees to resist recovery as long as possible to maximize their free rent.

*Id.* at 32 (citations omitted).

## II.

■ This Court has had two recent opportunities to examine the ordinary course of business exception to preference liability. *See In re Gull Air, Inc.*, 82 B.R. 1, 2–3 (Bankr.D.Mass.1988); *In re First Software Corp.*, 81 B.R. 211, 212–13 (Bankr.D.Mass. 1988). In both cases the Court cited *In re Craig Oil Co.*, 785 F.2d 1563 (11th Cir. 1986), a case in which the Court of Appeals for the Eleventh Circuit stated:

It seems clear ... that § 547(c) should protect those payments which do not result from 'unusual' debt collection or payment practices. *To the extent an otherwise 'normal' payment occurs in response to such practices, it is without the scope of section 547(c)(2).* Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts.

785 F.2d at 1566. *See also In re Alter Hall Construction Company Inc.*, 73 B.R. 989 (Bankr.D.Mass.1987), *aff'd*, 83 B.R. 180 (D.Mass.1988).

In *Craig Oil*, the debtor responded to a creditor's suggestion for "a show of good faith" by making payments with cashier's checks rather than with the corporate checks it had previously used. Although the creditor argued that despite the change from corporate to cashier's checks all of Craig's payments were made in accordance with the ordinary course of business, the bankruptcy court, which was affirmed by both the district and circuit courts, focused on the facts that the creditor almost never received cashier checks from customers, that the debtor seldom used them, that the debtor ceased buying from the creditor two weeks after the "suggestion" and that the "suggestion" was the sole reason for the change in payment.

A careful review of the facts in this proceeding warrants no other conclusion than that the two payments by certified check and the return of products worth $1.5 million were outside the normal course of business between Computer Associates and First Software. A detailed recitation of the facts would only unnecessarily reinforce the obvious. Computer Associates' demand for certified checks which had not been used by the Debtor in the past and the evidence of undue pressure and economic intimidation is more than sufficient for the Court to find that Computer Associates failed to meet its burden of proof with reference to the ordinary course of business exception to preference liability. *See, e.g., In re Brenton's Cove Development Co.*, 52 B.R. 287, 292 (Bankr.D.R.I.1985). ("These facts fit the classic preference situation of a long overdue obligation, pressure exerted by the creditor, and a lumpsum payment made shortly before the filing of the bankruptcy petition.").

■ Computer Associates attempts to rely upon a letter dated January 7, 1986 [sic] [6] from C. Hall Swaim, Counsel to the Creditors' Committee, to Computer Associates to establish an ordinary course of business defense and limit its preference exposure on the two checks to $46,295.86 [sic]. The letter makes reference to a statistical analysis of the payments made by First

Software to Computer Associates between April 19, 1985 and January 19, 1986. After taking into account both normal course and new value defenses, Swaim, in an attachment to his letter indicates that Computer Associates had a maximum exposure of $296,295.68 in preference liability and demands payment forthwith. The demand reflects an offer to reduce the amount sought by 10% if payment was made promptly. Swaim also indicates that absent prompt payment legal action would be commenced. Notably, in Computer Associates' case, legal action had been commenced. This Court, in a bench ruling, excluded the proffered exhibits on the grounds that they constituted an offer of settlement or compromise. Nevertheless, Computer Associates contends the letter and attachments are binding judicial admissions. The Court now reaffirms its bench ruling. Federal Rule of Evidence 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.... This rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay or proving an effort to obstruct a criminal investigation or prosecution.

Fed.R.Evid. 408. The Court of Appeals for the First Circuit, emphasizing the flexibility of the rule, has stated "evidence concerning negotiations may be admitted to establish admissions of fact rather than 'hypothetical or provisional concerns conditioned upon the settlement's completion.'" *Urico v. Parnell Oil Co.* 708 F.2d 852, 854 (1st Cir.1983). The Court concludes that the statistical analysis employed by the Creditors' Committee's accountant that focused upon an average payment time between invoice date and payment and includ-

---

**6.** The letter should have been dated January 7, 1987.

ed a calculation of the number of days constituting one standard deviation from the average time of payment can not be used as a factual admission of what is or is not within the ordinary course of business between First Software and Computer Associates. Moreover, the Court finds that the statistical analysis is not even relevant to the circumstances of this case, i.e., the demand for and use of certified checks. Thus, the preferential payments made by Computer Associates are not protected by the § 547(c) exception.

### III. PREJUDGMENT INTEREST

■ First Software claims it is entitled to prejudgment interest on $1,950,026, citing *inter alia Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729 (1st Cir.1982); *In re H & S Transportation Company, Inc.*, 78 B.R. 519 (Bankr.M.D.Tenn.1987); *In re Fulghum Construction Corp.*, 78 B.R. 146 (M.D.Tenn.1987). Computer Associates disagrees. It argues that no prejudgment interest should be awarded with respect to the product return for several reasons: 1) the value of the returned products is disputed; 2) no assessment can be made until the court allows the debtor to recover the value of property rather than the property itself.

In the *Robinson* case, *supra*, the Court of Appeals for the First Circuit stated the general rule with respect to prejudgment interest: "a prevailing plaintiff is entitled to prejudgment interest as an element of damages when the amount of his claim is either 'liquidated' or 'reasonably ascertainable by reference to established market values.'" 685 F.2d at 741. The court articulated the relevant inquiry as "'whether the demand is of such a nature that its exact pecuniary amount was either *ascertained,* or ascertainable by simple computation, or by reference to generally recognized standards such as market price[.]'" *Id.* Moreover, it generally is agreed that interest if it is awarded should be paid from the time a demand was made or, in the case where no prior demand was made, from the date the complaint was filed to the entry of the judgment. *In re Fulghum Construction Corp.*, 78 B.R. 146, 153

(M.D.Tenn.1987). The rate of interest used by the court in the *Fulghum* case is that set forth in 28 U.S.C. § 1961(a). *Id.* at 154.

The Court finds that an award of prejudgment interest would be unwarranted with respect to Count II in view of the good faith dispute as to the value of the returned products and the suggestion that the products be returned in lieu of a money judgment. Additionally, the Court cannot overlook the fact that while Poznansky admittedly instituted a policy of hounding First Software for payment Computer Associates had good reason to be displeased with the Debtor's conduct. The Debtor had a poor payment history with Computer Associates. In January 1986, the principals of First Software held out the prospect of a new, profitable relationship. When that prospect soured, it is hardly surprising considering the money at stake that Poznansky initiated phone calls and resorted to threats. Clearly, as in most preference situations, there are equities to be considered on both sides. Although preference recoveries inure to the benefit of the unsecured creditor body, in the context of this case, the Court finds that it would unduly penalize Computer Associates to award prejudgment interest to First Software on Count II.

In accordance with the foregoing, the Court hereby enters judgment in favor or Computer Associates and against First Software on Count I. It is further ordered that judgment enter in favor of First Software and against Computer Associates in the amount of $1,500,026 on Count II and in favor of First Software and against Computer Associates on Counts III and IV in the amount of $450,000 plus interest at the rate set forth in 28 U.S.C. § 1961(a) from May 20, 1986.