**In re AMERICAN FURNITURE OUTLET USA, INC.,**
**Debtor.**

**In re AMERICAN FURNITURE OUTLET USA, INC.,**
**Plaintiff,**

v.

**WOODMARK ORIGINALS, INC., Defendant.**

**Bankruptcy No. 95–13355 C–11G.**
**Adversary No. A–96–2067.**

United States Bankruptcy Court, M.D. North Carolina, Greensboro Division.

May 30, 1997.

50

J. Brooks Reitzel, Wyatt, Early, Harris &
Wheeler, High Point, NC, for Debtor.

Jan H. Samet, Keziah, Gates & Samet,
High Point, NC, for Woodmark Originals,
Inc.

## MEMORANDUM OPINION

CATHARINE R. CARRUTHERS,
Bankruptcy Judge.

THIS MATTER came on for hearing before the undersigned bankruptcy judge in Greensboro, North Carolina on April 18, 1997, to consider the merits of an adversary proceeding filed by the Debtor–in–Possession, American Furniture Outlet USA, Inc., under 11 U.S.C. § 547(b) and 11 U.S.C. § 550(a)(1), to recover an alleged preferential transfer extended to the Defendant, Woodmark Originals, Inc. J. Brooks Reitzel, Jr. appeared as counsel for the Debtor-in-possession; Woodmark Originals, Inc., was represented by Jan H. Samet.

This matter constitutes a core proceeding over which this court has jurisdiction. *See* 28 U.S.C. § 157(b)(2)(F) and Standing Order No. 10 of the United States District Court for the Middle District of North Carolina.

## FINDINGS OF FACT

1. American Furniture Outlet, USA, Inc., ("the Debtor") is a furniture retailer located in High Point, North Carolina.

2. The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on November 28, 1995.

3. On or about October 14, 1995 and within the 90–day period immediately preceding the filing of the bankruptcy petition, the Debtor authorized Woodmark Originals, Inc., ("Woodmark") to pick up various pieces of furniture from the Debtor. The furniture transferred by the Debtor consisted of various pieces the Debtor had purchased from Woodmark between 1991 and 1994. Some of the Woodmark pieces were exhibited on the Debtor's showroom for resale while others were used by the Debtor's employees as office furniture. Similarly, a few of the

pieces were kept in boxes while others were left completely exposed and unprotected.

4. As consideration for the transfer of the furniture by the Debtor, Woodmark entered a credit in the amount of $13,294.25 against its outstanding account with the Debtor. This amount represented a credit for all past due invoices.

5. When the furniture was received by Woodmark some of the pieces were damaged. According to the testimony of Stanley J. Hargrove, Sr., an employee of Woodmark, some of the furniture was nicked, scraped or stained. This damage rendered some of the pieces unmarketable. Four pieces that were ultimately discarded were a settee, two chairs and an ottoman.

6. Shortly after the furniture was returned to Woodmark, Woodmark held an employees' sale where it auctioned various pieces of its furniture inventory to its two hundred and fifty employees. Some of the Debtor's furniture was sold at the employees' sale; Woodmark received a total of $3,691.05 for those pieces. Woodmark incurred administrative expenses in the amount of $922.76 in conducting the employees' sale, but could not accurately state what portion of those expenses was directly attributable to the sale of the Debtor's furniture.

7. Although Woodmark was able to market some of the Debtor's furniture at the employees' sale, the majority of the furniture went unsold.

8. In the spring of 1996, those pieces of the Debtor's furniture that remained in Woodmark's inventory were sold to Porters, a furniture wholesaler located in Wisconsin. The sale to Porters involved a bulk sale in which the Debtor's furniture represented less than a third of the goods sold. The Debtor's portion of the furniture brought a sales price of $7,315. However, after such costs as a 6% sales commission in the amount of $438.90, a shipping and packaging charge of $512.75,

and a discount for freight credits in the amount of $5,048, Woodmark netted only $1,315.53 from the sale of the Debtor's furniture to Porters.

9. All parties stipulate that the transfer of furniture to Woodmark constitutes a preferential transfer which may be avoided pursuant to 11 U.S.C. § 547(b). The question the court must determine is what is the *value* of the transfer and to what extent Woodmark is liable to the bankruptcy estate for its receipt and subsequent conversion of the estate's property? It is the Debtor's contention that the returned furniture is worth the amount of the credit ($13,294.25) allowed against its outstanding account with Woodmark. In the alternative, the Debtor contends that the market value of the furniture is approximately 65% of wholesale, or $8,450. Contrariwise, Woodmark argues that the value of the returned goods is $2,983.82,[1] the amount netted from the employees' sale and the sale to Porters.

## DISCUSSION

■ Section 547(b) of the Bankruptcy Code empowers a trustee in bankruptcy (or a debtor) to "avoid any transfer of an interest of the debtor in property" provided certain parameters are met. Because both parties agree that the specific requirements of § 547(b) have been met in this case, the sole issue to be determined here is one of damages. Stated otherwise, the question this court must address is what, in terms of dollars, was "the interest" transferred by the Debtor and to what extent has the bankruptcy estate been diminished because of the transfer?

Although the Bankruptcy Code provides very detailed and intricate rules as to when a transfer shall be deemed an avoidable preference, the Code provides no real instruction as to how to value a debtor's "interest" in transferred property. While Section 550(a)[2] does

---

1. Although Woodmark argues this amount, the court believes this value reflects a mathematical error in the amount of $1,100. According to Woodmark's own documents, the net proceeds of the two sales appears to be $4,083.82.

2. 11 U.S.C. § 550(a) provides in relevant part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section … 547 … of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

empower a trustee to recover the value of transferred property, the statute does not define "value," nor indicate at what time "value" is to be determined. *Accord In re International Ski Service, Inc.*, 119 B.R. 654 (Bankr.W.D.Wis.1990).

The Code's failure to prescribe a valuation formula for Section 550(a) has engendered some case law addressing this issue. As stated in *In re Baker*, 17 B.R. 392, 395 (Bankr.W.D.N.Y.1982), "the purpose and thrust of [Section 550] is to restore the debtor's financial condition to the state it would have been had the transfer not occurred." *See also In re Aero–Fastener, Inc.*, 177 B.R. 120, 139 (Bankr.D.Mass.1994). One case where this maxim is applied exceedingly well is *In re King Arthur Clock Co. Inc.*, 105 B.R. 669 (Bankr.S.D.Ala.1989). In *King Arthur Clock*, a debtor transferred jewelry to a trade creditor. In exchange for the returned goods the creditor issued a credit memo in favor of the debtor in the amount of $17,-265.54. In determining whether the trustee should recover the cash value of the jewelry or the jewelry in kind, the court explained: "The term value [in Section 550(a) ] connotes market value. In the instant case, all we have is the amount the debtor was given credit for upon return of the jewelry. This figure does not provide the Court with information as to what the Trustee might receive were he to offer the jewelry for sale." *Id.* at 672. Viewing the credit memo as irrelevant to the determination of market value, the bankruptcy court ordered that the jewelry be returned in kind to the Debtor.

Contrary to *King Arthur Clock*, there are at least two cases where the courts have determined that the crediting of an account at the time of transfer is evidence of fair market value for Section 550(a) purposes. In *In re First Software Corp.*, 84 B.R. 278 (Bankr.D.Mass.1988), *aff'd*, 107 B.R. 417 (D.Mass.1989), the court found that the value a trade creditor ascribed in a credit memo for returned goods was evidence of the market value of the goods at the time of the transfer. Similarly, in *In re Albers*, 67 B.R. 530 (Bankr.N.D.Ohio 1986), the court stated:

A review of the documents offered in connection with this bankruptcy proceeding finds that the Defendant credited the Debtor's account in the amount of Six Thousand Five Hundred and no/100 Dollars ($6,500.00) as a result of the transfer.... The evidence presently before this Court reflects that at the time of the conveyance the Defendant valued [the collateral] at Six Thousand Five Hundred and no/100 Dollars ($6,500). Since this information constitutes the best evidence as to the value of the property, this Court will authorize a judgment for the avoidance of the transfer in this amount.

*Id.* at 534.

Although *Albers* and *First Software* stand for the proposition that the value credited to an account is evidence of the fair market value of transferred goods, it is important to note that in both those cases the subject credit memo was the *only* significant evidence as to market value. For example, in *First Software* the creditor had the opportunity to resell the subject collateral after its return by the debtor, but chose to retain the collateral instead. Stating that "[i]t is axiomatic that what a willing buyer will pay a willing seller is the absolute best indication of fair market value," the court found that the only transaction in the case which resembled a sale between a willing buyer and a willing seller was the transfer of the goods by the debtor coupled with the extension of the credit memo by the creditor. *First Software*, 84 B.R. at 284. Accordingly, the value of the credit memo was deemed by the court to be the fair market value of the goods transferred and, consequently, the amount recoverable by the trustee as a preference. *Id.* Likewise, in *Albers*, the only substantive evidence presented as to the value of the transferred property was the amount credited against the debtor's account. *Albers*, 67 B.R. at 534. Consequently, the court in that case also found that the amount credited was the market value of the transferred goods. *Id.*

In the instant case the evidence concerning the market value of the Debtor's furniture is not limited to the amount of credit allowed against the Debtor's outstanding account. In

(1) the initial transferee of such transfer or the

entity for whose benefit such transfer was made.

addition to the credit memo, the court must consider the evidence concerning the subsequent sale of the property by Woodmark to Porters and to Woodmark's employees.

When evaluating the relative weight of the evidence in this case, the court feels it is appropriate to keep a constant eye towards Chief Judge Gabriel's unassailable maxim that "what a willing buyer will pay a willing seller is the absolute best indication of fair market value." *In re First Software Corp.,* 84 B.R. at 284. Although it is arguable that the Debtor was a "willing seller" and Woodmark a "willing buyer" when the furniture was transferred to Woodmark, the court is of the opinion that such a position ignores the economic reality of the parties' situation at that time.

■ The preferential transfer in this case was engendered because the Debtor was not paying its debt to Woodmark. Faced with the Hobson's choice of receiving little or no payment on its account or accept the return of the furniture in full satisfaction of its debt, Woodmark chose to minimize its losses and accept the return of its furniture. Although Woodmark certainly exercised its own discretion in this regard, the court believes it is a real stretch to say Woodmark acted "willingly" with respect to the return of the furniture. In a very real sense, Woodmark's hands were completely tied; sound business judgment demanded that Woodmark accept the return of the furniture. In light of these facts, the court finds that the return of the furniture from the Debtor to Woodmark is not reflective of an arms-length transaction between a willing seller and a willing buyer. Accordingly, the amount of credit extended by Woodmark to the Debtor upon the transfer of the furniture will be accorded minimal weight in this court's determination of the fair market value of the transferred goods.[3]

Unlike the transfer of the furniture from the Debtor to Woodmark, the court finds that the employees' sale and the sale to Porters is very reflective of an arms-length transaction between a willing seller and willing buyer. In both of those circumstances there was no compulsion on the part of any party to sell or purchase the goods. Likewise, there is no evidence that Woodmark did not use its best efforts to maximize the prices obtained for the furniture nor is there any evidence that the transaction involving the employees' sale or the transaction involving Porters was a commercially unreasonable sale.[4] Accordingly, the court finds that the "price" brought at those sales constitutes the fair market value of the transferred goods.

■ Finally, the court is of the opinion that the fair market value of the goods (and the value of the preference) is properly reflected in the amount *netted* by Woodmark after costs and expenses, and not the amount grossed at the two liquidation sales. Under North Carolina law, an aggrieved seller (who acts in a commercially reasonable manner) is entitled to recover the costs associated with the care and resale of rejected goods after a buyer's breach. N.C.Gen.Stat. § 25–2–710. Since Woodmark acted in a commercially reasonable manner in this case and, absent the bankruptcy, would have been entitled to collect costs and expenses associated with the sales as part of its state-law damages claim against the Debtor, the court does not feel it would be equitable to require Woodmark to assume those costs simply because the Debtor has filed bankruptcy. The court believes a contrary ruling would have a chilling affect on commerce inasmuch as it would force aggrieved sellers (such as Woodmark) to wait 90 days before exercising their resale rights under the UCC if they wish to be insulated from future preference actions seeking val-

3. Likewise, the court will accord little evidentiary weight to the testimony offered by the Debtor that it could have sold the furniture for approximately 65% of its wholesale value, or $8,450. The Debtor had every opportunity to liquidate the furniture and elected not to do so. Instead, the Debtor elected to voluntarily return the property to Woodmark and have it liquidate the furniture. Because the furniture was eventually sold in the open market, the court will look to that price in evaluating the fair market value of the furniture, rather than the speculative assessments of the Debtor.

4. Under state law, the principal limitation on a seller's right to dispose of collateral is the requirement that he proceed in good faith and in a commercially reasonable manner. N.C.Gen. Stat. § 25–2–706 Official Comment.

ues in excess of the net amount received on resale. In order to prevent the imposition of increased liability on sellers of goods who reasonably exercise their state law rights, the court holds that when a seller acts in good faith and resells returned goods in a commercially reasonable manner, the amount that may be recovered as a preference is the amount netted by the seller after costs and expenses have been deducted from the gross proceeds of any such sale.

## CONCLUSION

For the reasons stated herein, the court finds and concludes that the value lost by the Debtor's estate because of the preferential transfer is the net amount that Woodmark was able to obtain for the property at resale.[5] Accordingly, the Debtor is entitled to recover from Woodmark the sum of $5,006.58, which represents the fair market value of the property transferred.

A separate Order will be entered in accordance with the foregoing Memorandum Opinion.

**5.** Because Woodmark could not accurately recount what percentage of the expenses from the employees' sale was attributable to the sale of the Debtor's furniture, the court will not allow Woodmark any offset for those expenses in this preference action.