In re EBC I, INC., f/k/a eToys, Inc., Reorganized Debtor.

EBC I, Inc., f/k/a eToys, Inc., Plaintiff,

v.

America Online, Inc., Defendant.

Bankruptcy No. 01-00706(MFW). Adversary No. 03-50003.

United States Bankruptcy Court, D. Delaware.

Jan. 10, 2008.

**352**

Richard D. Allen, Esquire, Thomas W. Briggs, Jr., Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Plaintiff.

Karen C. Bifferato, Esquire, Marc J. Phillips, Esquire, Connolly Bove Lodge & Hutz LLP, Wilmington, DE, James R. Wrathall, Esquire, Carol J. Banta, Esquire, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, for Defendant.

### *OPINION*[1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Complaint filed by EBC I, Inc., f/k/a eToys, Inc. ("eToys") against America Online, Inc. ("AOL") for avoidance of a fraudulent conveyance. For the reasons stated below, the Court will enter judgment in favor of AOL.

### I. *BACKGROUND*

On March 7, 2001, eToys filed a voluntary petition under chapter 11 of the Bankruptcy Code. On that same day, eToys

---

1. This Opinion, and the accompanying Findings of Fact ("FOF") and Conclusions of Law ("COL"), constitute the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

ceased operations and shut down its website. All of eToys' assets were subsequently liquidated.

Prior to the bankruptcy filing, eToys and AOL had entered into an Interactive Marketing Services Agreement dated August 10, 1999 (the "1999 Agreement"), under which AOL committed to provide online advertisements and other services for eToys for three years for $18 million, payable in installments. (FOF 19) eToys paid $7.5 million through July 2000 in accordance with the 1999 Agreement, but AOL failed to perform its obligations, providing less than half the advertisements promised in the first year. (FOF 19, 44, 51, 55, 58) As a result, the 1999 Agreement was modified by an Amendment dated November 15, 2000. (FOF 50, 54, 56) eToys paid $750,000 at that time (in addition to the $7.5 million it had already paid) and AOL agreed to provide certain advertisements for the following two years without further payments by eToys. (FOF 57)

After a disastrous holiday season, eToys realized it would not be able to meet its projected sales figures. (FOF 74, 144) It began conserving cash, hired an investment banker, and attempted to sell itself as a going concern. (FOF 75, 77, 78) By the end of February 2001, however, it was apparent that eToys' marketing efforts were unsuccessful. On February 26, 2001, eToys issued a press release announcing its financial difficulties and its intent to fire all its employees, shut down its website, and file bankruptcy. (FOF 88, 89) Two days later, AOL terminated the 1999 Agreement pursuant to section 5.6, which allowed termination if eToys became insolvent or filed bankruptcy. (FOF 21, 91)

On January 3, 2003, eToys filed an adversary complaint (the "Complaint") against AOL seeking (1) to avoid and recover alleged fraudulent transfers pursuant to sections 548 and 544 of the Bankruptcy Code and applicable state law, (2) damages for breach of contract, and (3) equitable relief based on unjust enrichment. According to eToys, the payments made under the 1999 Agreement, the Amendment, and the termination of the 1999 Agreement by AOL were all avoidable transfers of property of eToys.

AOL filed a motion to dismiss the Complaint. At oral argument held on April 30, 2003, the Court granted the motion to dismiss with respect to the unjust enrichment count because the parties conceded that their relationship was governed by the 1999 Agreement.

On May 14, 2004, eToys filed a motion for partial summary judgment, and AOL filed a motion for summary judgment on all counts. eToys conceded in its response to AOL's motion that its breach of contract claim and any claim for recovery of payments made under the 1999 Agreement prior to the Amendment on November 15, 2000, should be dismissed. On December 7, 2006, the Court granted AOL's motion for summary judgment in part and dismissed Counts IV and V of the Complaint. The Court also granted eToys' Motion for Partial Summary Judgment on Count I of the Complaint (the fraudulent conveyance claim) in part and scheduled an evidentiary hearing on the remaining issues.

The evidentiary hearing was held on June 26, 2007, and the matter was taken under advisement. Post-trial briefing is complete, and the matter is ripe for decision.

## II. JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) & 157(b)(2)(A), (E), (H) & (O).

## III. DISCUSSION

### A. Applicable Law

The Plaintiff argues that both the November 15, 2000, Amendment to the 1999

Agreement and the February 28, 2001, termination of the 1999 Agreement are avoidable as constructively fraudulent conveyances under section 548 of the Bankruptcy Code and under applicable state law.

**1.** *Fraudulent Transfer under Section 548(a)(1)(B)*

The version of section 548(a)(1) applicable to this case provides that:

The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . .

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1) (2004).[2] To recover under section 548, eToys has the burden of establishing that while it was insolvent there was a transfer of an interest in its property for less than reasonably equiva-

lent value. *See, e.g., BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 144 (3d Cir. 1996).

**2.** *Fraudulent Transfer under State Law*

Under section 544 of the Bankruptcy Code, a debtor may avoid any transfer of property of the estate that is voidable under applicable state law by certain creditors. 11 U.S.C. § 544.

In this case, the 1999 Agreement provides that disputes concerning it are governed by Virginia law. (Ex. P–1 at AOL 00229) Virginia law provides, in relevant part, that "[e]very gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law . . . by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made. . . ." Va.Code Ann. § 55–81 (West 2003). *See also In re Meyer*, 244 F.3d 352, 355 (4th Cir.2001) (discussing valuation of consideration for purposes of avoidance action).

Even "slight consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to save such a transfer from avoidance [under Virginia law] in the commercial context." *In re Best Products Co.*, 168 B.R. 35, 52 (Bankr. S.D.N.Y.1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995). *See also C–T of Virginia, Inc. v. Euroshoe Assocs. Ltd. P'ship*, No. 91–1578, 1992 WL 12307, at *2 (4th Cir. Jan.29, 1992) (Virginia law "does not require [the transfer of] reasonably equivalent value.").

---

**2.** Section 548 was modified by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which became effective October 17, 2005, after the instant adversary proceeding was commenced.

Therefore, to be avoidable as a fraudulent conveyance under Virginia law, eToys had to be insolvent or rendered insolvent at the time of the transfer and the transfer had to be for *no* consideration.

### B. *November 15, 2000, Amendment*

#### 1. *Fraudulent Transfer under Section 548(a)(1)(B)*

##### a. *Solvency*

In the December 7, 2006, Opinion, the Court concluded that there was a genuine issue of material fact in dispute as to whether eToys was insolvent on November 15, 2000, at the time the Amendment was executed.

At the trial, AOL presented testimony of an expert (Robert Hutchins) to the effect that eToys was solvent on November 15, 2000. (FOF 134, 141, 146) eToys disputes this but did not present any expert testimony in rebuttal.

█ The term insolvent is defined in the Bankruptcy Code generally to mean a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A). In evaluating the fair value of a company's assets for purposes of determining solvency, the appropriate premise of value must be applied: either the going concern premise of value or the liquidation premise of value. *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.),* 134 F.3d 188, 193 (3d Cir.1998) (finding that fair valuation of TWA's assets required choice between going concern and liquidation premises of value); *American Classic Voyages Co. v. JP Morgan Chase Bank (In re American Classic Voyages Co.),* 367 B.R. 500, 508 (Bankr.D.Del.2007) ("In determining a 'fair valuation' of the entity's assets, an initial decision to be made is whether to value the assets on a going concern basis or a liquidation basis.").

AOL's expert used the going concern premise of value in analyzing eToys' solvency as of November 15, 2000. In doing so, he considered the standard factors a valuation analyst uses to determine the appropriate premise of value: (1) whether the company continued to make capital investments and open new operating facilities during the relevant period; (2) whether the company had access to capital and credit; (3) whether management and the investment community were optimistic about the company's prospects; (4) whether the company's employment base was expanding; (5) whether there was a discovery of material fraud; and (6) whether there was a loss of major customers or vendors. (FOF 105)

█ The Court concludes that it was appropriate to use the going concern premise of value in analyzing eToys' solvency as of November 15, 2000. (FOF 108) eToys concedes that it was operating on that date. *See, e.g., Moody v. Sec. Pac. Bus. Credit, Inc.,* 971 F.2d 1056, 1067 (3d Cir.1992) ("Where bankruptcy is not 'clearly imminent' on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis."). "[A] business does not have to be thriving in order to receive a going concern valuation. Before the going concern valuation is to be abandoned, the business must be 'wholly inoperative, defunct or dead on its feet.'" *American Classic Voyages,* 367 B.R. at 508 *(quoting Fryman v. Century Factors (In re Art Shirt Ltd., Inc.),* 93 B.R. 333, 341 (E.D.Pa. 1988)). *Accord Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.),* 281 B.R. 535, 541 (Bankr.D.Del.2002).

eToys argues, however, that the Court must consider that eToys (and the internet

industry generally) collapsed by the end of 2000. eToys contends that it is "common sense" to conclude that, because AOL's expert admits that eToys was insolvent by the end of December 2000, and nothing unforeseen happened between November 15 and December 31, 2000, eToys must have been insolvent on November 15 as well. *Cf. American Classic Voyages,* 367 B.R. at 512 (concluding that the debtor became insolvent as a result of "the unforeseeable events of 9/11, and their effect upon the travel industry as a whole [which] forced the Debtors into bankruptcy.").

The Court rejects eToys' analysis. eToys' condition was fundamentally different on November 15 and December 31, 2000. On November 15, eToys (and its investors and industry experts) all expected that it would have a tremendously successful holiday season. (FOF 115, 117) During the year prior to November 15, 2000, eToys expanded its warehouse operations and moved into a new headquarters. (FOF 109) Full-time employees increased from 300 to 1000 in the prior 18 months and eToys' customer base doubled between December 1999 and December 2000. (FOF 110, 111) In addition, eToys had access to capital and credit during that period; it was able to raise $175 million in its initial public offering in May 1999, $145 million by issuing unsecured convertible notes in December 1999, $100 million by a preferred stock offering in June 2000, and $40 million in a revolving line of credit on November 15, 2000. (FOF 113)

Further, at the time of the Amendment, both eToys' management and the investment community had positive views about its long-term prospects. (FOF 115) In fact, it was not until after the Thanksgiving weekend and even into December that it became apparent that eToys would not be able to make its sales projections. (FOF 74, 144) Although eToys did issue a

press release on December 15, 2000, adjusting its sales projections downward, eToys still felt that it would be able to sell its business as a going concern. (FOF 75) It hired an investment banker to find a buyer, and several prospective buyers expressed interest. (FOF 77, 78) In the interim eToys instituted cash management strategies to keep it operating until a sale could be consummated. (FOF 76, 79, 80) It was not until February that it became apparent that eToys would not be able to sell itself as a going concern and had to liquidate its assets. (FOF 82, 84–87) As a result, the Court concludes that AOL's expert used the appropriate methodology to value eToys' assets on its balance sheet as a going concern in determining whether eToys was solvent on November 15, 2000. (FOF 108)

### i. *Balance Sheet Test*

Applying the going concern premise of value to the balance sheet test, AOL's expert made various adjustments to the book value of eToys' assets to reflect their market value. *See, e.g., Peltz v. Hatten,* 279 B.R. 710, 743 (D.Del.2002) ("While the [solvency] inquiry is labeled a 'balance sheet' test . . . . it is appropriate to adjust items on the balance sheet that are shown at a higher or lower value than their *going concern value* and to examine whether assets of a company that are not found on its balance sheet should be included in its fair value.") (emphasis added), *aff'd sub nom. In re USN Commc'ns, Inc.,* 60 Fed.Appx. 401 (3d Cir.2003).

eToys finds fault with many of the adjustments. For example, AOL's expert made a 21% upward adjustment from the book value of inventory (reflected at cost) which the Court finds was conservative. eToys argues, however, that the inventory should be valued at book value because that is what eToys could have expected to

receive on a forced sale and because it reflects the "wholesale fair market value" of the inventory. The Court disagrees. eToys was not a wholesaler; it was a retailer. To conclude that the value of the inventory was only the book value assumes that eToys was not selling it at anything above its cost to eToys. That is contradicted by the evidence. At the time (November 15, 2000), eToys was selling its inventory in the ordinary course of business at a profit, not at the wholesale price. (FOF 124) Therefore, the Court concludes that the conservative upward adjustment to the book value of the inventory was appropriate.[3]

■ The expert made further adjustments, including to the intangible assets listed on the books.[4] eToys presented no evidence that these adjustments were not appropriate, but argues that it was inappropriate to include any value for intangibles because the balance sheet should include only tangible assets that are readily saleable. *See, e.g., In re WRT Energy Corp.*, 282 B.R. 343, 369 (Bankr.W.D.La. 2001) (concluding that only assets capable of liquidation may be included in the valuation of assets); *Kendall v. Sorani (In re Richmond Produce Co., Inc.)*, 151 B.R. 1012, 1019 (Bankr.N.D.Cal.1993) (assets, such as goodwill, that are speculative and cannot separately be sold should be excluded from the value of a debtor's assets),

*aff'd*, 195 B.R. 455 (N.D.Cal.1996); *Coated Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.)*, 144 B.R. 663, 672 (Bankr.S.D.N.Y.1992); 2 *Collier on Bankruptcy*, ¶ 101.32[4] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev.2007). eToys also disagrees with the method by which AOL's expert valued the intangible assets (based on eToys' market capitalization) because it disappeared overnight and had no rational connection to the valuation of assets in a "conversion to cash" analysis.

■ The Court rejects eToys' arguments. The Third Circuit has held that "in determining insolvency under § 548(a)(2)(B)(i), it is appropriate to take into account intangible assets not carried on the debtor's balance sheet, including, *inter alia*, good will." *Mellon Bank, N.A. v. Metro Commc'ns, Inc. (In re Metro Commc'ns, Inc.)*, 945 F.2d 635, 647 (3d Cir.1991). *See also Shubert v. Lucent Technologies, Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234, 274 (Bankr. D.Del.2005) (indicating that the balance sheet test may take into account value not "used to prepare a typical balance sheet" because it is "based upon a fair valuation and not based on generally accepted accounting principles.") (citation omitted). *See generally*, Shannon P. Pratt et al., *Valuing a Business* 309–10 (4th ed.2000)

---

3. Both parties cite IRS Revenue Procedure 77–12, 1977 WL 42697 to support their opposing arguments: eToys for the proposition that "[t]he replacement cost method generally provides a good indication of fair market value if inventory is readily replaceable in a wholesale or retail business ..." and AOL for the proposition that inventory must be valued to reflect its resale value. *See* I.R.S. Rev. Proc.2003–51, 2003–2 C.B. 121, 2003 WL 21465304 (replacing Rev. Proc. 77–12). The Court finds the Revenue Procedure, like generally accepted accounting principles, to be unhelpful because the tax and accounting implications of how assets are listed on a com-

pany's balance sheet often have little to do with what a willing buyer and willing seller would agree is the fair market value of those assets.

4. For example, the expert reduced the book value of goodwill from $124 million to zero, the property and equipment (including software) by 33%, and miscellaneous other assets (excluding cash and cash equivalents) by 15%. In addition, the expert valued eToys' interest in Babycenters at $5 million (or half the ultimate sale price of that asset). (FOF 123–31)

(inclusion of intangibles is required under accepted valuation principles).

■ Further, the Third Circuit has stated that the Court should consider the market capitalization of a company in valuing its intangible assets. Indeed, the Third Circuit has expressed that there is no error in "choosing to rely on the objective evidence from the public equity and debt markets." *VFB LLC. v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir.2007). Therefore, it was appropriate for AOL's expert to include the value of eToys' intangibles on the adjusted balance sheet. (FOF 123, 130)

■ eToys also objects to the inclusion of any value for the software, which was under license to eToys and may not have been assignable. AOL counters that the software had some value to eToys because it was using it in its operations and, therefore, the Court should consider it as part of the going concern value of eToys. The Court agrees with AOL that the software had some value to eToys and, therefore, should be considered part of the going concern value of eToys. (FOF 126)

■ AOL's expert made no adjustment to eToys' liabilities, but did not include the preferred stock as debt. eToys asserts that the expert should have treated the preferred stock as a liability because it was listed on eToys' balance sheet as debt in the amount of $37 million in accordance with generally accepted accounting principles ("GAAP"). (Ex. P–11 at 4) *See, e.g., Trans World Airlines*, 134 F.3d at 190 (holding that in determining solvency, liabilities are to be taken at their face value); *Winstar*, 348 B.R. at 278 ("[ T] he insolvency test anticipates that liabilities will be valued at their face value."); *Hanna v. Crenshaw (In re ORBCOMM Global, L.P.)*, Bankr.No. 00–3636, Adv. No. 02–1914, 2003 WL 21362192, at *3 (Bankr.

D.Del. June 12, 2003) ("[F]or purposes of determining whether a debtor is insolvent under section 547, the liabilities of the debtor must be valued at face value.").

AOL responds that GAAP is not relevant to determining the fair market value of assets (or liabilities). Although GAAP treats redeemable preferred stock as a liability, AOL notes that the SEC regulations confirm that preferred stock is neither a current nor a long-term liability. *See Balance Sheets*, 17 C.F.R. § 210.5–02 (2006).

■ The Court agrees with AOL. GAAP does not deal with the true market value of assets or the determination of what are legal liabilities of a company. *Cf. In re Lease–A–Fleet, Inc.*, 155 B.R. 666, 679 (Bankr.E.D.Pa.1993) ("Courts are not required to rely upon GAAP standards when determining the issue of insolvency."). Just as GAAP rules regarding the book value of assets does not determine their fair market value, similarly GAAP rules for treating debt as equity and vice versa are not relevant to determining whether they are truly debt or equity. Instead, the Court must consider the totality of the circumstances to determine if the obligation is, in fact, debt or equity. *See, e.g., Brown v. Shell Canada, Ltd. (In re Tenn. Chem. Co.)*, 143 B.R. 468, 473 (Bankr.E.D.Tenn.1992) (rejecting contention of trustee's expert that preferred stock should be treated as debt for solvency analysis); *Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.)*, 103 B.R. 610, 622–24 (Bankr.E.D.Pa.1989) (holding that redemption value of redeemable stock is not a liability of the debtor), *aff'd*, 121 B.R. 442 (E.D.Pa.1989). *Cf. In re Trace Int'l Holdings*, 301 B.R. 801, 805–06 (Bankr. S.D.N.Y.2003) (treating preferred stock as a liability because the court had previously re-characterized the stock as debt); *See generally*, Robert J. Stearn, Jr., *Proving*

*Solvency: Defending Preference and Fraudulent Transfer Litigation,* 62 Bus. Law. 359, 382–84 (2007) (surveying case law and concluding that preferred stock is treated as equity not debt in insolvency analyses).

In this case, the preferred stock was payable as debt at the discretion of eToys. (FOF 131) Given its dire financial condition at the time, it is unlikely that eToys would have paid it as debt.[5] Therefore, the Court concludes that the preferred stock need not be considered as debt for purposes of determining the going concern value of eToys under the balance sheet test. (FOF 131) Consequently, the Court finds that the specific adjustments made by AOL's expert to eToys' balance sheet were appropriate. (FOF 123–31)

Based on the adjustments to the balance sheet, AOL's expert concluded that the value of eToys' assets was approximately $302 million without considering any value for the intangible assets and approximately $545 million with those assets. From this, the expert concluded that eToys' assets exceeded its debts by approximately $15 to $258 million. Thus, the Court concludes that, under the balance sheet test, eToys was solvent on November 15, 2000. (FOF 132–34)

### ii. *Cash Flow Test*

■ Even using other accepted methods of calculating solvency, AOL's expert opined that eToys was solvent as of November 15, 2000. The cash-flow test (also called the inability-to-pay-debts test) is an alternative solvency test which assesses whether, at the time of the transfer, the debtor intended to incur or believed that it would incur debts beyond its ability to pay as such debts matured. 11 U.S.C. § 548(a)(1)(B)(ii)(III). *See also WRT*

*Creditors Liquidation Trust v. WRT Bankr.Litig. Master File Defendants (In re WRT Energy Corp.),* 282 B.R. 343, 414–15 (Bankr.W.D.La.2001) ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured.").

AOL's expert determined that eToys was solvent under the cash flow test because eToys was able to pay, intended to pay, and in fact was paying its debts as they came due as of November 15, 2000. The Court agrees with that conclusion. (FOF 142–44) Therefore, under the cash-flow test, the Court concludes that eToys was solvent on November 15, 2000.

### iii. *Capital Adequacy Test*

A third test for solvency is the unreasonably small capital test, which analyzes whether at the time of the transfer the company had insufficient capital, including access to credit, for operations. 11 U.S.C. § 548(a)(1)(B)(ii)(II). *See also Moody,* 971 F.2d at 1073 ("[I]t was proper for the district court to consider availability of credit in determining whether [the debtor] was left with an unreasonably small capital.").

AOL's expert concluded that eToys did not have unreasonably small capital as of November 15, 2000, because eToys reported on September 30, 2000, that it had sufficient capital to fund operations through June 2001, and thereafter was able to obtain a $40 million revolving line of credit in November 2000. Again the Court agrees with those conclusions and finds that, under the capital adequacy test, eToys was also solvent on November 15,

---

**5.** In fact, in its plan of reorganization, eToys did not treat the preferred stock as general unsecured debt and, instead, canceled it. (D.I. 1385, art. VII §§ 4.10 cl. 6, 7.1(b))

2000, because it retained sufficient capital for operations, including access to credit. (FOF 135–41)

Consequently, the Court concludes that under any of the standard methodologies, eToys was solvent as of November 15, 2000. As a result, the Amendment to the 1999 Agreement executed on that date cannot be avoided as a fraudulent conveyance under section 548 of the Bankruptcy Code.

### 2. *Fraudulent Transfer under State Law*

Because eToys was solvent on November 15, 2000, the Amendment executed on that date is not avoidable as a fraudulent transfer under Virginia law. Va.Code Ann. § 55–81 (West 2003). *See also Meyer,* 244 F.3d at 355.

### C. *February 28, 2001, Termination of 1999 Agreement*

#### 1. *Fraudulent Transfer under Section 548(a)(1)(B)*

##### a. *Solvency*

In the December 7 Opinion, the Court concluded that eToys was insolvent on February 28, 2001, when AOL terminated the 1999 Agreement. This was, in fact, conceded by AOL, which terminated the 1999 Agreement because of eToys' announcement that it was insolvent. At the evidentiary hearing held on June 26, 2007, AOL's expert opined that eToys became insolvent in early December 2000. Therefore, as of the termination of the 1999 Agreement on February 28, 2001, eToys was insolvent. (FOF 149)

##### b. *Transfer of an Interest in Property*

In the December 7 Opinion, the Court also concluded that AOL's termination of the 1999 Agreement, and consequently the

retention of the payments made by eToys in advance for services never delivered, constituted a transfer of property of eToys, namely the advertising services for which eToys had pre-paid. *See, e.g., EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.),* 356 B.R. 631, 637 (Bankr.D.Del. 2006).

Further, the Court concluded that, even if the 1999 Agreement permitted termination or provided that payments made by eToys were non-refundable, they still might be recoverable as a fraudulent conveyance. *See, e.g., R.M.L.,* 92 F.3d at 148 (concluding that even though fees were non-refundable, they may still be recoverable if their payment is found to be a fraudulent conveyance). The issue remaining, therefore, is not whether the 1999 Agreement provided for the payment of non-refundable fees but whether eToys received reasonably equivalent value for loss of the services for which those fees paid. *Id.*

■■■ The Court narrowed its ruling, however, by holding that only a contract whose termination resulted in the loss of valuable property rights of a debtor, such as entitlement to services for which the debtor had paid in advance, is potentially recoverable under section 548. "The fraudulent conveyance statutes are intended to prevent an insolvent or undercapitalized debtor's estate and its creditors from being wrongfully deprived of assets which could be otherwise utilized for the payment of creditors." *Metro Water & Coffee Servs., Inc. v. Rochester Cmty. Baseball, Inc. (In re Metro Water & Coffee Servs., Inc.),* 157 B.R. 742, 747 (Bankr.W.D.N.Y. 1993).

##### c. *Less than Reasonably Equivalent Value*

###### i. *Law of the Case*

eToys contends that the Court made several determinations in the December 7

Opinion which are law of the case and mandate a conclusion that eToys received less than reasonably equivalent value as a result of the termination of the 1999 Agreement. It notes that the Court concluded that "to the extent [eToys] paid more to AOL than the value of the services provided to it by AOL, the termination of the Contract eliminated that value." *EBC I*, 356 B.R. at 642. eToys also contends that the Court found as a fact that eToys had received only $2.3 million in services prior to the Amendment of the 1999 Agreement while it had paid $8.25 million. Therefore, eToys asserts that the only issue to be determined in the evidentiary hearing was how much eToys had received from AOL between the Amendment on November 15, 2000, and termination of the 1999 Agreement on February 28, 2001.

AOL disagrees with eToys' characterization of the Court's December 7 Opinion. It notes that neither the summary judgment motion nor the Court's Opinion addressed the value that was exchanged under the 1999 Agreement and Amendment or the proper method for determining that value.

The Court agrees with AOL. In the December 7 Opinion, the Court did not make any finding as to the value that was received by eToys under the Agreement and its Amendment nor how that value should be calculated. The Court did state that "the parties had *apparently* reconciled the accounts for the first year of the [1999 Agreement] ... and agreed that AOL had provided $2.3 million in services" to eToys. *Id.* at 642 (emphasis added). However, because there was no evidence as to what services were provided after the

first year, the Court found there was a dispute as to a genuine issue of material fact. *Id.* Thus, the Court agrees with AOL that it did not decide the value issue and it is not law of the case. *Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co.*, 988 F.2d 414, 429 (3d Cir.1993) (holding that the law of the case doctrine is discretionary and applies, if at all, only to a ruling on a point of law, not to general discussion of issues in the case).

Based on the evidence presented at the June 26, 2007, hearing it is now clear that there was not an agreement as to the "value" of the services provided by AOL in the first year of the 1999 Agreement. Although the parties agreed that a certain number of impressions had been provided (which were listed on the 1999 Agreement attachment at prices totaling only $2.3 million), the parties also agreed in the Amendment that AOL had satisfied in full its obligation to provide services to eToys in the first year. Further, AOL presented evidence that the value of services provided by it under the 1999 Agreement was not limited to the list of impressions with prices which is attached to the Agreement. For example, AOL notes that in the first year it provided a substantial number of Welcome Screen impressions to eToys, which eToys admitted were very valuable to it, even though no price was allocated to them in the Agreement.[6] (FOF 27)

The Court agrees with AOL's contention that it must consider the value of all the services rendered by AOL under the 1999 Agreement and the Amendment (and compare them to the payments made) in order to determine if eToys received less than

---

**6.** No price was allocated to the Welcome Screen impressions because AOL did not sell them to others at that time. (FOF 27–28) The value of them to eToys was enormous because all AOL Members see the Welcome Screen when they sign in, few if anyone else had ads there, and it was easier to get customers to click through on such an ad early in their internet browsing. (FOF 27) AOL has since sold Welcome Screen impressions to others at substantial prices. (FOF 28)

reasonably equivalent value under the 1999 Agreement and the Amendment as a result of the termination.

### ii. *Determining Value Transferred*

Section 550 provides that where a transfer is avoided under section 548, the estate may recover the property transferred or the value of such property. 11 U.S.C. § 550(a)(1). Because the purpose of sections 548 and 550 is preservation of the estate for the benefit of creditors, the value of property transferred is determined from the perspective of the estate and the creditor body. *See, e.g., Metro Commc'ns, Inc.*, 945 F.2d at 646 ("The purpose of [section 548] is estate preservation . . . ."); *Rochez Bros., Inc. v. Sears Ecological Applications Co., (In re Rochez Bros., Inc.),* 326 B.R. 579, 588 (Bankr. W.D.Pa.2005) ("Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."); 2 *Collier Bankruptcy Manual* ¶ 550.02[3] (Henry J. Sommer et al., eds., 3d ed. rev.2007) (same).

The Third Circuit has held that the Court must determine the net effect of the transaction on the debtor and that if the debtor's "realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received." *Metro Commc'ns, Inc.*, 945 F.2d at 647. The Court, therefore, must consider what value the 1999 Agreement, as amended, had to eToys immediately before and after the termination.

### iii. *Value to eToys*

eToys contends that the value of the 1999 Agreement that was lost to eToys by its termination is calculated as follows. Because eToys paid $8.25 million and received only $2.3 million in the first year, it was entitled to another $5.95 million in services during the remaining two years of the Agreement. The termination occurred approximately six months later, leaving at least 75% of the services to be performed. Therefore, eToys seeks approximately $4.5 million for the value of unperformed services under the 1999 Agreement for which it had already paid.

AOL contends that under Virginia law, eToys was in breach of the 1999 Agreement at the time of its termination and that, consequently, eToys had no remaining rights that were lost by its termination. Specifically, AOL asserts that the eToys announcement in February 2001 that it would shut down its website and cease operations constituted a material breach of numerous ongoing obligations of eToys under the 1999 Agreement and the Amendment that were material to AOL. (FOF 34–39) Because eToys had no further rights to performance from AOL under the terms of the 1999 Agreement, based on eToys' own actions and circumstances, AOL argues that the 1999 Agreement had no further value to eToys as of February 28, 2001. (FOF 154–57) eToys disagrees and contends instead that AOL was in breach of the Agreement for failure to deliver the requisite number of impressions.

The Court finds it unnecessary to decide this issue, however, because it concludes that in any event, the 1999 Agreement had no value to eToys immediately before its termination. As of the termination date, eToys was in dire financial straits. By the end of February eToys had finished its online sale of product (at drastically reduced prices) and had announced that it was firing all its employees, shutting down its website and ceasing operations. (FOF 84, 89) In fact, eToys did exactly that before it filed its chapter 11 petition on March 7, 2001. It sold all its assets in a liquidation

sale shortly afterwards. (FOF 99, 100) As a result, the Court concludes that the 1999 Agreement, which provided for the delivery of impressions and other ads for eToys' website, had no value to eToys because eToys was no longer operating. Therefore, the Court concludes that eToys is entitled to no recovery in this case. *Cf., Metro Water & Coffee Servs., Inc.,* 157 B.R. at 746–47 (holding that termination of concession agreement was a transfer for purposes of fraudulent conveyance statute though it was not avoidable because the debtor's material defaults meant it had no legal rights).

### iv. *Value if Sold*

#### a. *Assignability*

 eToys contends nonetheless that the 1999 Agreement had value because it could have been sold as part of the sale of eToys' business assets. AOL disagrees contending that the 1999 Agreement was not assignable under state law or the Bankruptcy Code.

 Pursuant to section 365(c) of the Bankruptcy Code, a debtor may not assume or assign an executory contract[7] if applicable state law excuses a party to the contract (other than the debtor) from accepting performance from or rendering performance to an entity other than the debtor. 11 U.S.C. § 365(c)(1)(A-B). Under Virginia law, a contract is not assignable if the identity of the contracting parties is material to the ongoing performance of the contract. *See, e.g., Stone Street Capital, Inc. v. Granati (In re Granati),* 270 B.R. 575, 581–82 (Bankr.E.D.Va.2001) ("[C]ontract rights are freely assignable unless the identity of the contracting parties is material . . . ."), *aff'd,* 307 B.R. 827 (E.D.Va.2002), *aff'd* 63 Fed.Appx. 741 (4th Cir.2003); *In re DeLuca,* 194 B.R. 65, 77 (Bankr.E.D.Va.1996) (holding that an operating agreement governing a limited liability company was unassignable, since "the identity of the managers [of the company was] material to the very existence of the company."). The identity of a party is material to the performance of a contract if the contract is founded on one of the parties maintaining trust or confidence in the ability to perform, judgment, or business experience of the other party. *See, e.g., McGuire v. Brown,* 114 Va. 235, 76 S.E. 295, 297 (1912) (contract not assignable because the seller of certain real property "was prompted to enter into th[e] contract . . . by her confidence in [the counter-party's] judgment, ability, opportunity . . . and perhaps other considerations which then appeared sufficient."); *Epperson v. Epperson,* 108 Va. 471, 62 S.E. 344, 346 (1908) ("[E]xecutory contract[s] for personal service, founded on personal trust or confidence, [are] not assignable.").

In this case, the AOL-eToys business relationship was founded on AOL's trust and confidence in eToys' unique attributes, as well as its experience, all of which were relevant to eToys' ability to serve AOL Members and protect their privacy interests as set forth in the 1999 Agreement. (FOF 173–79) Therefore, the Court concludes that under Virginia law AOL would not have been required to accept performance under the 1999 Agreement from any party other than eToys. Consequently, the

---

7. An executory contract is "a contract under which the obligation[s] of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F.2d 36, 39 (3d Cir.1989); 3 *Collier on Bankruptcy* ¶ 365.02[1] at 365–17 n. 1 (Lawrence P. King et al., eds., 15th ed. rev.2000). The 1999 Agreement was an executory contract. (FOF 16–41, 92–95)

1999 Agreement was not assumable or assignable under section 365(c) of the Bankruptcy Code.

### b. *Value if Assignable*

■ Even if the 1999 Agreement could have been assigned by eToys as part of the sale of its assets in the bankruptcy case, AOL contends that the price it would have received would have been de minimis. AOL's expert testified that the value of the 1999 Agreement, if it could have been assigned, was $16,500 to $38,500 based on the price which eToys' other assets realized in the sale under chapter 11. (FOF 171)

eToys argues that AOL's expert used the wrong premise of value (liquidation) in valuing the 1999 Agreement and that a going concern premise of value should have been used. eToys asserts that the Court must consider the fair market value of the impressions, not a liquidation value. *See, e.g., BFP*, 511 U.S. at 545, 114 S.Ct. 1757 (stating that reasonably equivalent value under section 548 has "a meaning similar to fair market value."); *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir.2006) (requiring an examination of the totality of the circumstances to determine the fair market value of the benefit received as a result of the transfer). *Accord* 5 *Collier on Bankruptcy* ¶ 550.02[3][a] (2007) ("When the value of the property is recovered, as opposed to the property itself, the term 'value' refers to fair market value.").

AOL argues that the liquidation premise of value is appropriate because the Court must consider the condition eToys was in and its ability to sell the assets at issue. It contends that although eToys filed a chapter 11 petition, it was clear at that time that eToys was liquidating, not reorganizing. (FOF 150)

■ The Court agrees with AOL. The question is not under what chapter of the Bankruptcy Code eToys filed, but whether a liquidation of its assets was imminent, because a debtor can liquidate its assets under chapter 11 as well as under chapter 7 of the Bankruptcy Code. *See, e.g., Gillman v. Scientific Research Prods. Inc. (In re Mama D'Angelo)*, 55 F.3d 552, 556–57 (10th Cir.1995) ("Liquidation value is appropriate 'if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic.'" *(quoting In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 131 (Bankr.D.Mass. 1989))). *See also Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 517 n. 3 (8th Cir.2004) (recognizing that liquidation under chapter 11 is permitted by most courts); *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1352 (5th Cir.1989) (discussing the propriety of liquidating reorganizations and noting that "although Chapter 11 is titled 'Reorganization,' a plan may result in the liquidation of the debtor"); *In re Jartran, Inc.*, 886 F.2d 859, 868 (7th Cir.1989) (acknowledging the permissibility of liquidating plans under chapter 11).

The totality of the circumstances test mandates that the Court consider eToys' actual circumstances and intentions at the time of termination of the 1999 Agreement. Though a chapter 11 petition was filed, eToys announced in its press release its inability to continue as a going concern and its intention to liquidate. Therefore, the liquidation premise of value was appropriately used by AOL's expert to conclude that, even if the 1999 Agreement had been assignable in eToys' bankruptcy case, the price paid for that contract would have been de minimis.

### c. *Subsequent Sale by AOL*

eToys argues nonetheless that it clearly lost something of value because the termi-

nation permitted AOL to sell the impressions previously reserved for eToys that were not provided to it. eToys argues that the Court should consider, as evidence of the value of the 1999 Agreement, the price at which AOL subsequently sold the impressions to others because courts routinely determine the value of property recoverable from a transferee based on evidence of what the transferee actually did receive, or could have received, in a further disposition of the property at issue. *See, e.g., Kidder Skis Int'l v. Williams,* 60 B.R. 808, 810 (W.D.Mo.1985) (reversing bankruptcy court and reducing trustee's recovery under section 550(a)(1) based on lesser amount transferee of ski inventory was able to obtain through its resale of such items); *Shearer v. Tepsic (In re Emergency Monitoring Tech., Inc.),* 366 B.R. 476, 510 (Bankr.W.D.Pa.2007) (authorizing trustee to recover value equal to the sale price the transferee was able to obtain in later sale of monitoring contracts it had seized from debtor); *Baldi v. Lynch (In re McCook Metals, L.L.C.),* 319 B.R. 570, 593 (Bankr.N.D.Ill.2005) (authorizing trustee's recovery under section 550(a) based on defendant's share of the benefit received when contract to acquire smelter was transferred to entity that defendant controlled); *American Furn. Outlet USA, Inc. v. Woodmark Originals, Inc. (In re American Furn. Outlet USA, Inc.),* 209 B.R. 49, 52–53 (Bankr.M.D.N.C.1997) (rejecting amount specified in credit memo as a basis for determining the value of property transferred under section 550(a) in favor of amounts actually obtained by transferee in subsequent sale of property); *Ferrari v. Computer Assoc. Int'l, Inc. (In re First Software Corp.),* 84 B.R. 278, 284 (Bankr.D.Mass.1988) (stating "[i]t is axiomatic that what a willing buyer will pay a willing seller is the absolute best indication of fair market value" and holding that value of property recoverable by trustee

should be based on what transferee actually received on resale of the property rather than what was specified in credit memo issued to debtor); *Speciner v. Gettinger Assoc. (In re Brooklyn Overall Co., Inc.),* 57 B.R. 999, 1004 (Bankr.E.D.N.Y.1986) (authorizing trustee's recovery against landlord under section 550(a)(1) measured by the value of the additional rent the landlord was able to collect from new tenant following debtor's transfer of lease back to landlord). eToys argues that the best evidence of the value of the services it lost is represented by the prices contained in the Amendment because they were based on AOL's November 2000 rate card of prices quoted to other retailers. That totals approximately $4.5 million.

AOL contends, however, that eToys has failed to present any evidence of the fair market value of the impressions. It notes that there is no evidence in the record that AOL was able to resell those impressions or at what price. Even if they were resold, AOL argues that the prices on its rate card in November 2000 are not indicative of the fair market value because the evidence established that impressions were sold to large retailers like eToys at substantial discounts from the rate card prices. (FOF 22–24)

The Court agrees with AOL. While courts have considered subsequent sales by transferees of fraudulent conveyances as evidence of the property's fair market value, there is no evidence in this case of any subsequent sale or the value received from that sale. Further, courts have held that the contract price that the parties had negotiated is not evidence of the fair market value of the property. *See, e.g., American Furn. Outlet,* 209 B.R. at 53; *First Software Corp.,* 84 B.R. at 284. Therefore, eToys' reliance on the prices in the 1999 Agreement as amended is not evidence of the value of the impressions nor evidence

that AOL was able to resell those impressions after the termination.

Given the fact that the 1999 Agreement had no value to eToys once eToys ceased operating, was not assignable by eToys to another, and had de minimis value, the Court finds that eToys has failed to meet its burden of proving that it lost anything of value by the termination of the 1999 Agreement. In these circumstances, the Court agrees with AOL that it would be an impermissible windfall to creditors to make AOL pay eToys $4.5 million for the termination of the 1999 Agreement, when eToys would have received little or nothing of value from the continuation of the Agreement. Therefore, the Court concludes that eToys is not entitled to any recovery from AOL under section 548 of the Code.

### 2. Fraudulent Transfer under State Law

#### a. Solvency

As noted above, the Court has already concluded that, as of the termination of the 1999 Agreement on February 28, 2001, eToys was insolvent.

#### b. Transfer of an Interest in Property

Also, as the Court concluded above, the termination of the 1999 Agreement on February 28, 2001, did constitute a transfer of an interest in property of eToys.

#### c. Less than Reasonably Equivalent Value

■ Under Virginia law, the test is not whether reasonably equivalent value was exchanged, but rather whether any value was exchanged. "[S]light consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to save such a transfer from avoidance [under Virginia law] in the commercial context." *In re Best Products Co.*, 168 B.R. at 52. *See also C–T of Virginia*, 1992 WL 12307, at *2 (Virginia law "does not require [the transfer of] reasonably equivalent value."). As noted above, however, eToys lost nothing of value from the termination of the 1999 Agreement. Therefore, the Court concludes that even if the termination is avoidable under Virginia law, eToys is entitled to no recovery.

### IV. CONCLUSION

For the foregoing reasons, the Court will grant judgment in favor of AOL.

An appropriate Order is attached.

### ORDER

**AND NOW,** this 10th day of **JANUARY, 2008,** upon consideration of the Complaint of eToys against AOL and for the reasons set forth in the accompanying Opinion and Findings of Fact, it is hereby

**ORDERED** that judgment is entered in favor of AOL.