In re Richard J. MADDALENA, Diane K. Maddalena aka Delores K. Maddalena, dba Satellite T.V. fdba Lamppost Pizza # 1 fdba Lamppost Pizza # 2 fdba Lamppost Hardtimes Pizza & Billards, Debtors.

David A. GILL, Chapter 7 Trustee, Plaintiff,

v.

Richard J. MADDALENA, an individual, Diane K. Maddalena, an individual, Richard S. Maddalena, an individual, Monier Gabra, an individual, Lucy Gabra, an individual, and Does 1 through 25, inclusive, Defendants.

Bankruptcy No. LA 91–87665–AG.
Adv. No. LA 93–03356–AG.

United States Bankruptcy Court, C.D. California.

Jan. 12, 1995.

Steven E. Smith, Danning, Gill, Diamond & Kollitz, Los Angeles, CA, for David A. Gill, Chapter 7 Trustee.

Scott W. Carlson, Carter, Mosley & Carlson, Pasadena, CA, for defendant Richard S. Maddalena.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

*Background.*

Plaintiff, a Chapter 7 Trustee, alleges that Richard S. Maddalena ("Defendant"), the son of Richard J. Maddalena ("Debtor"), received an avoidable fraudulent conveyance of the

Debtor's interest in a promissory note under applicable California and federal bankruptcy law. The action was tried to the Court in Los Angeles on November 18, 1994, with the undersigned presiding as a visiting judge. After due consideration of the evidence and testimony and of the parties' written and oral arguments, the Court intends this Memorandum as its findings of fact and conclusions of law. F.R.B.P. 7052.[1]

*Facts.*

Many of the relevant facts are undisputed having either been stipulated by the parties in the pretrial order or having been conceded at the time of trial.

Debtor formerly owned a pizza parlor business. In May, 1990, Debtor sold this business to Michael Markulis for $175,000. Markulis gave Debtor $50,000 in cash, and executed a promissory note in Debtor's favor calling for monthly payments of principal and interest beginning in July, 1990, with the remaining balance due in June, 1994. The interest rate on the deferred balance under the note was 13% per annum, which was a market rate at the time. From July 1990, through June, 1991, Markulis made all monthly payments when due to Debtor.

Debtor, who was also involved in other business enterprises, needed cash to pay various operating and tax expenses. He made some attempts to sell his interest in the Markulis note, as well as another promissory note he held, but received no offers, probably because the Markulis note was unsecured.

On June 18, 1991, Debtor offered the note to his son, the Defendant, who paid him $30,000 for his interest. While there is some argument over this point, the Court concludes that the price paid by Defendant to Debtor was based almost solely on the amount Debtor could afford to pay by borrowing on his house, and not on any value assessments made by Debtor or Defendant as to the note. At that time, the principal balance due on the note from Markulis to Debtor was $97,262.58, although Markulis

---

1. Plaintiff's claims against Defendant discussed herein are all that remain unresolved. Plaintiff has previously voluntarily dismissed his claims against the Defendants/Debtors. Defendants Ga- bra have not responded to the Complaint and Plaintiff indicated at trial that he would be moving for entry of a default judgment on his claims against them.

had the option of prepaying the note for 80% of the amount due. Markulis did not prepay the note at that time, however, and thereafter continued to make regular monthly installments, now to Defendant, through January, 1994, when the balance was paid off approximately five months early.

While not stipulated in the pretrial order, the Court understands Defendant to have conceded, and the Court would otherwise find from the record, that at the time Debtor transferred his interest in the Markulis note to Defendant, he was insolvent. This fact is conspicuous from Debtor's bankruptcy schedules included in the record. Debtor filed for bankruptcy relief on August 19, 1991.

*Issues.*

■■■ Based upon this collection of facts, Plaintiff, as Chapter 7 trustee of Debtor's bankruptcy estate, sued Defendant to set aside the transfer of the promissory note as a fraudulent conveyance. Plaintiff relies on California law [2] as well as Section 548(a)(2) of the Bankruptcy Code.[3] California's fraudulent conveyance statutes are similar in form and substance to the Code's fraudulent transfer provisions, and the Ninth Circuit has held that the state laws may be interpreted contemporaneously. *In re United Energy Corp.,* 944 F.2d 589, 594 (9th Cir.1991) Therefore, only Section 548(a)(2) of the Code will be discussed in this decision. That statute provides:

**§ 548. Fraudulent transfers and obligations**

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

**2.** California Civil Code §§ 3439.01 et seq.

**3.** Plaintiff also originally claimed the transfer of the note from Debtor to Defendant could be avoided for "actual fraud" under Section 548(a)(1) and corresponding state law. Howev-

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

11 U.S.C. § 548(a)(2)(A), (a)(2)(B)(i).

While the facts are unpretentious, several formidable questions are raised by the parties in disposing of Plaintiff's claims against Defendant:

(1) What was the value of Debtor's interest in the promissory note at the time he transferred it to the Defendant?

(2) Did the $30,000 paid by Defendant for the purchase of the note from Debtor constitute "reasonably equivalent value"?

(3) If the transfer of the note is avoidable, is Defendant entitled to a credit for the monies he paid Debtor as a good faith transferee under Section 548(c)?

(4) Assuming again the transfer is avoided, what is the extent of Plaintiff's recovery?

These issues are examined separately below.

*Value of the Note.*

■■■ Defendant paid his father $30,000 to purchase Debtor's rights to collect the monies owed by Markulis under the terms of the promissory note. Before the Court can determine whether this purchase price was "reasonably equivalent" to the value of the collection rights under the note as required by the fraudulent conveyance laws, the value of the note must be determined. The determination of value must be made as of the date of the transfer, or in other words, as of June, 1991. *In re Morris Communications NC, Inc.,* 914 F.2d 458, 466 (4th Cir.1990).

The parties each offered the testimony of an expert to the Court on this issue. After due consideration of the presentations by these witnesses, and their respective qualifications, the Court finds that the note had a value of $65,000 on the date it was transferred. The Court reaches this conclusion in

er, the Court understands that Plaintiff now concedes, and the Court would otherwise find from the record, that Debtor did not possess the requisite fraudulent intent to set aside the transfer on these grounds.

reliance upon the testimony of Mr. Kapko, the witness offered by Plaintiff, whose presentation the Court found to be thorough and competent, and superior to the expert testimony sponsored by Defendant.

Mr. Kapko has a college degree in finance, has been a C.P.A. for many years, and has had extensive experience in private lending endeavors, including the purchase and sale of loan notes. Most importantly, Mr. Kapko has recently been working with bankruptcy liquidations involving large numbers of notes. He has participated in hundreds of transactions involving millions of dollars. In short, the Court found Mr. Kapko's qualifications to give expert testimony on this question more impressive and relevant than those of the witness offered by the Defendant.

The Court also appreciated the approach taken by the witness in valuing Debtor's interest in the Markulis note. Because of the risk involved in collecting an unsecured note, and any buyer's desire to receive a significant return on the money invested in such a purchase, Mr. Kapko's value estimate involves a substantial discount from the balance due under the note. On the other hand, while it is true the note was unsecured, Mr. Kapko identified other positive factors in assigning his value estimate to the note. In particular, Mr. Kapko discussed Markulis' evident willingness and capability to pay the note, as evidenced by his payment record, his net worth, and the extent of the downpayment he made as part of the transaction. In addition to assessing the risk involved in buying this note, Kapko also gave consideration to the extent that a potential purchaser of the note would expect as a return on the investment. Through his analysis, the witness opined that $65,000 would be a fair market price if the Markulis note were to be sold on the open market in June, 1991. The Court concurs in this conclusion.

*Reasonably Equivalent Value.*

The Court next turns to whether the transfer of the note from Debtor to Defendant can be avoided under Section 548(a)(2). A recent discussion of this statute by the U.S. Supreme Court is instructive here:

Section 548 of the Bankruptcy Code, 11 U.S.C. § 548, sets forth the powers of a trustee in bankruptcy ... to avoid fraudulent conveyances. It permits to be set aside not only transfers infected by actual fraud but certain other transfers as well—so-called constructively fraudulent transfers. The constructive fraud provision at issue in this case applies to transfers by insolvent debtors. It permits avoidance if the trustee can establish (1) that the debtor had an interest in property; (2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) that the debtor received "less than a reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548(a)(2)(A). It is the last of these four elements that presents this issue in the case before us.

*BFP v. Resolution Trust Corp.,* —— U.S. ——, ——, 114 S.Ct. 1757, 1760, 128 L.Ed.2d 556 (1994) (footnotes omitted). Just as in *BFP*, the first three of the four elements of the Plaintiff's avoidance claim are not in question here. It is the fourth element of Plaintiff's claim that divides the parties. Was the $30,000 paid by Defendant "reasonably equivalent" to the $65,000 market value of the Debtor's note under these facts?

Defendant argues that under all the circumstances, $30,000 was not an unfair price for Defendant to pay Debtor. Defendant was not a professional lender; was apprehensive about the collectibility of the note; and the amount paid was as much as he could reasonably raise or afford under these facts. Under these facts, Defendant asserts the $30,000 paid for the note was a "reasonable" price.

■ However, Defendant's argument misperceives the approach required under the Code in this situation:

In making [a Section 548(a)(2)(A) value] determination, the analysis is directed at what the debtor surrendered and what the debtor received irrespective of what any third party may have gained or lost. This is so because the policy behind section 548 is to preserve the assets of the estate.

*In re United Energy Corp.*, 944 at 597 (citations omitted). Stated another way, what constitutes reasonably equivalent value must be determined from the standpoint of Debtors' creditors, not from Defendant's perspective. *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d 479, 484 (4th Cir.1992); *Hansen v. Cramer*, 245 P.2d 1059, 1061, 39 Cal.2d 321, 323 (1952); *Patterson v. Missler*, 238 Cal.App.2d 759, 766, 48 Cal.Rptr. 215 (Ct. App.1966). While it may have been reasonable in Defendant's eyes to fix the price for the note at $30,000, such is not a critical determination in this context.[4] Instead, the Court must focus on the net effect of the transfer on the Debtor's estate. *In re Ozark Restaurant Equipment Co., Inc.*, 850 F.2d 342, 345 (8th Cir.1988) (Reasonably equivalent value depends on market conditions faced by a willing seller and a willing buyer and not on the financial demands of seller.)

■ From the proper perspective, it is clear the amount paid by Defendant was not reasonably equivalent to the value of the property transferred. The Debtor's creditors suffered a significant net loss in comparing the value of what was transferred by Debtor, to the value of what he received in exchange. A $30,000 cash payment is not the reasonable equivalent of a promissory note with a present cash market value of $65,000, and the pool of assets available to satisfy creditors's claims against Debtor was substantially depleted by this transaction. Seen in this light, the transfer of the note from Debtor to Defendant is avoidable by Plaintiff under Section 548(a)(2).

*Defendant's Good Faith.*

Even though a transfer is avoidable by a bankruptcy trustee, a good faith transferee may be allowed to retain the transfer to the extent of the value given in exchange. *See* 11 U.S.C. § 548(c).[5] In this case, Defendant could be entitled to a credit against the amount of the avoided transfer for the $30,000 he paid to purchase the note. However, Defendant bears the burden of proving that he acted in good faith in the transaction. *In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, 535 (9th Cir.1990).

■ In cases involving actual fraud by the debtor-transferor, the courts define the "good faith" required by Section 548(c) to mean that viewed objectively, the transferee neither knew nor should have known of the fraudulent nature of the transfer. *See Agricultural Research*, 916 F.2d at 535 and the cases cited therein. Under these decisions, one who knowingly or recklessly participates in a fraudulent scheme designed to injure or obstruct the transferor's creditors will not be protected even though value is given in exchange for the transfer. *Id.*; *In re Roco Corp.*, 701 F.2d 978, 985 (1st Cir.1983); *In re Candor Diamond Corp.*, 76 B.R. 342, 351 (Bankr.S.D.N.Y.1987); *In re Health Gourmet, Inc.*, 29 B.R. 673, 677 (Bankr.D.Mass. 1983); *Rossen v. Villanueva*, 166 P. 1004, 1005, 175 Cal. 632, 633 (1917); *Knapp v. Elliott*, 184 P.2d 934, 937, 81 Cal.App.2d 667, 670 (1947).

This case law is not very helpful, though, in defining when a transferee acts in good faith where a constructively fraudulent transfer is found to exist. Here Plaintiff has not shown, nor does he argue, that Debtor acted with intent to defraud his creditors in his sale of the Markulis note to Defendant. Under the facts, it likewise cannot be argued that Defendant participated in any fraud. What the facts do show is that Debtor was pressed by his immediate financial needs for cash to accept what he could promptly get from the sale of the note, and that Defendant was a convenient buyer under the circumstances.

---

4. While Defendant's conduct is not dispositive on the "reasonably equivalent value" issue, it may be highly relevant in determining whether Defendant is a good faith transferee for value under Section 548(c), as is discussed below.

5. § 548. Fraudulent transfers and obligations
. . . .
   (c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

■ One commentary suggests that a transferee's knowledge of, or reasonable cause to suspect, the transferor's insolvency may be inconsistent with good faith. 4 L. King, Collier on Bankruptcy, ¶ 548.07[3], 548–81 (15th ed. 1990). Those are not the circumstances in this case. While Defendant was obviously aware of Debtor's need for cash, the evidence does not show Defendant was aware of Debtor's insolvency or his impending bankruptcy.

Plaintiff argues that because Defendant made no significant investigation of the facts, of Markulis, or of the actual value of the note in determining his offer to Debtor, the transfer was not an arm's length transaction. Plaintiff also points to the father/son relationship between the parties. The Court is not persuaded by these contentions.

Precisely because Defendant did not have more information and facts available to him about the risk involved in the purchase of the note, or as to Debtor's precarious financial condition, his good faith defense is more credible. Similarly, while the parties are relatives, there is no indication that Debtor selected Defendant as a possible buyer for this reason over any other prospect. This appears to be a transaction based on convenience and opportunity, not an attempt to keep an asset in the family and away from Debtor's creditors.

In summary, it appears Defendant was inexperienced, unsophisticated and largely uninformed, and consequently, his motives in buying the note for the funds he had available seem bona fide to the Court. Defendant acted in good faith, and he is therefore entitled to protection against avoidance of the transfer to the extent of his $30,000 payment under Section 548(c).

*Extent of Plaintiff's Recovery.*

■ Having determined that the transfer in question is avoidable, subject to a credit in Defendant's favor, what does the Plaintiff recover under these circumstances? Section 550(a) of the Code permits recovery of a fraudulent conveyance from the transferee by a trustee of "the property transferred, or if the court so orders, the value of such property...." 11 U.S.C. § 550(a).

In this case, since the Markulis note has been satisfied by payment, it cannot effectively be retransferred to the Debtor's bankruptcy estate. This is precisely the predicament envisioned by Congress when it authorized a court to order that the "value" of the note be returned to Plaintiff by Defendant. *See In re Classic Drywall, Inc.,* 127 B.R. 874, 877 (D.Kan.1991); *In re International Ski Service, Inc.,* 119 B.R. 654, 658 (Bankr. W.D.Wis.1990); *In re First Software Corp.,* 107 B.R. 417, 423 (D.Mass.1989). The parties do not dispute this conclusion. However, in fashioning a money judgment to be granted Plaintiff and against Defendant to effect a retransfer of the note, the parties offer drastically different approaches.

Predictably, Plaintiff argues that he should receive a judgment against Defendant for the full amount of all payments Defendant received from Markulis, plus interest from the date of each payment. All told, this amounts to $109,880.10 by Plaintiff's calculations. He insists that because Markulis proved credit worthy, such a sum is necessary to truly compensate the bankruptcy estate for its loss, and that any lesser award inappropriately "rewards" Defendant for his participation in the transaction.

No more surprisingly, Defendant contends that if the transfer is avoided, the Court should limit its award to Plaintiff to the value of the note at the time it was transferred. Because the value of the note was unliquidated until trial, Defendant argues there is no basis for an award of prejudgment interest.

It appears that under either California law or the Bankruptcy Code, the Court is called upon to fashion an equitable recovery in these circumstances, giving consideration to the rights of all the parties involved. Because both parties make legitimate arguments on this aspect of Plaintiff's case, the Court's method of calculating the judgment differs from that suggested by either Plaintiff or Defendant.

First and foremost, it seems to this Court that the object of any remedy should be, to the extent practicable, to "undo" the transfer and to restore the parties to their pretransfer positions. This necessarily entails examining the rights of the parties and facts as

they existed on the date of the transfer in June, 1991. Because of this, the Court will decline Plaintiff's invitation to fashion an award based upon hind-sight, and to require that Defendant disgorge all payments he received on the note after he acquired it. Rather, any judgment in Plaintiff's favor should be based upon the value of the note to Defendant at the time it was transferred, which the Court has previously determined to be $65,000.

This technique is consistent with the case law discussed above instructing that the proper focus in these actions is not on what the transferee gained by the transaction, but rather on what the bankruptcy estate lost as a result of the transfer. Undoubtedly calculating a judgment in this manner benefits Defendant under these facts. It does not do so, however, at the expense of Debtor's bankruptcy estate.

The Court's method of computing a judgment properly places the risk of loss in connection with an avoidable transfer on Defendant as the transferee. By contrast, Plaintiff's analysis would place that risk on the estate, as is perhaps best shown by a hypothetical. Using Plaintiff's theory, had Markulis been unable to pay the note, and defaulted after making, for example, only $10,000 in payments to Defendant, Plaintiff's recovery against Defendant would have been severely limited. Under such facts Plaintiff would be properly complaining about the inequity of charging all of the decline in the value of a transferred asset to the bankruptcy estate. In the Court's opinion, the more consistently equitable approach in this situation is to grant the bankruptcy estate what it would have had assuming the transfer had not been made: an unpaid note worth $65,000.

Plaintiff argues that had the note not been transferred, the trustee in Debtor's bankruptcy case would have been entitled to collect all payment made by Markulis for the benefit of the Estate. That the trustee would have done so, however, is speculation. Holding, as opposed to selling the note, is an attractive course of action only if it is assumed that all payments over the remaining three year term on the note would be made.

Such a decision exposes the estate and the trustee to considerable risk of loss. It is just as likely that Plaintiff as trustee would have recalled his duty to "reduce to money the property of the estate for which the trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest...." 11 U.S.C. § 704(1). As opposed to sitting on an unsecured note in hopes it would be paid in full over several years, it is just as reasonable to assume that Plaintiff would have sold the note as quickly as possible, thereby allowing the bankruptcy estate to be closed.

Also, as observed above, this is not a situation wherein Defendant, as transferee, engaged in some sort of sanctionable conduct in connection with his purchase of the note, motivating the Court to deprive him of any benefits of his purchase. There is no reason here to punish Defendant, and Plaintiff's concerns that Defendant not receive a "windfall" are not justified. In short, Plaintiff should be granted a judgment against Defendant for the market value of the note at the time of its transfer, which Plaintiff's own witnesses established as $65,000.

Plaintiff's claims for an award of prejudgment interest deserve consideration, though. On the one hand, the Court has determined that Plaintiff is not entitled to the payments made to Defendant on the note after it was transferred. Therefore, Plaintiff is also not entitled to interest on those payments. However, under these facts, the bankruptcy estate has been deprived of the cash value of the note, and in addition, it has also lost the advantage of any earnings from that cash value pending this litigation. Defendant has effectively denied the estate these earnings while resisting Plaintiff's demands to avoid the transfer.

It would be unfair to charge Defendant with interest on the value of the note until Defendant's obligation to return the note arose. Stated another way, the transfer of the note was not avoidable until Debtor filed for bankruptcy relief, thereby creating a bankruptcy estate with a trustee clothed with special avoidance powers, and those powers were asserted. Using this analysis, then, the Court would fix the date when Defendant

should fairly be expected to pay interest on the value of the note on the date of commencement of this adversary proceeding. On that date, Defendant assumed the consequences associated with his failure to compensate the bankruptcy estate for its loss occasioned by the fraudulent conveyance of the note.

*Conclusion.*

In summary, the Court finds the value of the note at the time it was transferred by Plaintiff to Defendant to be $65,000. The Court next finds that Defendant did not give "reasonably equivalent value" for the transfer of the note, and therefore, the Court concludes that the transfer is avoidable by Plaintiff under Section 548(a)(2) of the Bankruptcy Code.

As authorized by Section 550(a), the Court concludes under these facts that Plaintiff is entitled to a money judgment against the Defendant for the value of the property transferred as of the date of transfer in the sum of $65,000. In addition, Plaintiff is entitled to interest at the federal rate [6] from the date of commencement of this adversary proceeding until the judgment is satisfied. To give proper effect to Defendant's status as a good faith transferee for value under Section 548(c) of the Code, Defendant is entitled to a credit against the judgment balance when paid to the extent of the value he gave for the transfer, or in other words, for $30,000.

Counsel for Plaintiff shall submit a form of judgment consistent with this Memorandum for entry by the Court, which form has been approved by counsel for Defendant.