

# FILED

JUL 18 2023

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>PACIFIC LINKS U.S. HOLDINGS, INC.,<br>　　　　　Debtor. | BAP No. HI-22-1191-BCL<br><br>Bk. No. 21-00094 |
| TIANJIN DINGHUI HONGJUN EQUITY<br>INVESTMENT PARTNERSHIP (LIMITED<br>PARTNERSHIP),<br>　　　　　Appellant,<br>v.<br>PACIFIC LINKS U.S. HOLDINGS, INC.;<br>HAWAII MVCC LLC; HAWAII MGCW<br>LLC; MDRE LLC; MDRE 2 LLC; MDRE 3<br>LLC; MDRE 4 LLC; MDRE 5 LLC,<br>　　　　　Appellees. | Adv. No. 21-90009<br><br>**MEMORANDUM**∗ |

Appeal from the United States Bankruptcy Court
for the District of Hawaii

Robert J. Faris, Chief Bankruptcy Judge, Presiding

Before: BRAND, CORBIT, and LAFFERTY, Bankruptcy Judges.

## INTRODUCTION

Appellant Tianjin Dinghui Hongjun Equity Investment Partnership

(Limited Partnership) ("TDH") appeals a judgment in favor of appellees

---

∗ This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

Pacific Links U.S. Holdings, Inc. ("PLUSH"), Hawaii MVCC LLC, Hawaii MGCW LLC, MDRE LLC, MDRE 2 LLC, MDRE 3 LLC, MDRE 4 LLC, and MDRE 5 LLC (collectively, "Debtors"), ruling that certain obligations and transfers by Debtors to TDH were avoidable as fraudulent transfers under both federal and Hawaii law. Seeing no reversible error by the bankruptcy court, we AFFIRM.

## FACTS

### A.    Background of the parties

Du Sha, an individual, sought to develop an international network of elite golf courses and golf course residential communities. In this effort, Du Sha established a global enterprise of companies under the umbrella of Pacific Links International Company.

Debtors are among Du Sha's companies. Debtor PLUSH is a holding company and the sole member of the other seven subsidiary Debtors. PLUSH does not conduct any independent business and does not generate its own income from operations.

The subsidiary Debtors collectively owned a 644-acre mixed used development property located in the Makaha Valley on Oahu (the "Makaha Property"). The parcels comprising the Makaha Property were acquired between 2011 and 2015 for approximately $35 million, and the subsidiary Debtors held title to the parcels. Debts were incurred to acquire some of the parcels. Promissory notes for $5 million and $3.78 million were secured by first mortgages on those parcels.

2

From 2015 to 2019, Debtors expended upwards of $15 million towards the development of the Makaha Property for the golf course community (the "Makaha Project"). MVCC operated a country club and golf course on its parcels which produced some income but not enough to cover its ordinary operating expenses. A second golf course already existed on MGCW's parcels, but it had not been used since 2011. The remaining parcels were largely unimproved land that did not generate income but incurred expenses. To fund operating and development costs for the Makaha Project, Debtors regularly received equity infusions from Asian affiliates owned by Du Sha.

Tianjin Kapolei Business Information Consultancy Co., Ltd. ("TKB") is a Chinese limited partnership also owned by Du Sha. TKB is an affiliate of Debtors but not a subsidiary. In 2017, TDH made a loan to TKB for RMB 240 million. In 2018, TDH agreed to extend the 2017 loan and made an additional loan to TKB for RMB 160 million. Debtors were neither borrowers nor guarantors of the 2017 and 2018 loans, and no loan proceeds were directly disbursed to any of Debtors.

**B.    The alleged fraudulent transfers**

In 2019, nearing the 2017 and 2018 loans' maturity date, Du Sha told TDH that there was insufficient cash to repay the loans. Du Sha painted a rosy picture of his companies' prospects and requested an extension.

On December 11, 2019, TKB, Debtors and certain affiliates executed a series of agreements with TDH ("2019 Transaction").[1] The 2019 Transaction

---

[1] To evidence the 2019 Transaction, Debtors executed several documents: a

3

restructured the 2017 and 2018 loans by creating a "new" loan to TKB for the total amount currently owed to TDH – approximately $57 million USD. Proceeds were used to repay the full amount owed to date, and TDH agreed to extend the loans' maturity date. Thus, the 2019 Transaction was in substance only an extension of the maturity date of the old loans.

TDH was willing to grant the extension only if Debtors (and others) became obligated to repay the loans and the subsidiary Debtors granted security interests in all of their real estate to secure the loans. This was an essential inducement for, and a precondition of, TDH's willingness to enter into the 2019 Transaction. As a result of the 2019 Transaction, Debtors became liable for the first time to TDH for the principal obligation of $57 million. They guaranteed[2] the debt and granted mortgages and security interests in all their assets to TDH. Debtors did not receive anything from TDH in exchange for the obligations they undertook and transfers they made, and TDH did not satisfy any of Debtors' indebtedness.

TKB failed to make the first payment due for the 2019 Transaction in January 2020. TKB also failed to pay the next payment due in March 2020. In April 2020, after TKB had still failed to pay, TDH accelerated the debt and demanded immediate payment in full. In February 2020, Debtors were unable to pay their real property tax installments and have continued to be

Framework Agreement; a Secured Guaranty; mortgage documents from each of the subsidiary Debtors; and a Membership Interest Pledge Agreement made by PLUSH.

[2] The operative provisions of the Secured Guaranty made clear that Debtors were not mere guarantors; rather, they were primarily and directly liable to TDH as co-obligors with all other obligated parties.

unable to pay taxes on all of their properties. The outstanding mortgage debts for some of Debtors' parcels were also not paid, and the lender obtained foreclosure judgments in November 2020.

## C.    Debtors' bankruptcy filing and adversary proceeding

After Debtors filed chapter 11[3] bankruptcy cases on February 1, 2021, they filed an adversary proceeding against TDH, seeking to avoid the guarantees and mortgages they granted under the 2019 Transaction as constructive fraudulent transfers under § 548(a)(1)(B) and HRS § 651C-4(a)(2). Debtors later moved for partial summary judgment on the element that Debtors received less than reasonably equivalent value in exchange for the obligations they incurred and the transfers they made under the 2019 Transaction. The bankruptcy court granted Debtors' motion, finding that they did not receive reasonably equivalent value in exchange for the obligations and transfers. The remaining issues went to trial.[4]

## D.    Trial on the alleged fraudulent transfers

Debtors submitted direct testimony declarations from Harry Chang, Debtors' CFO since 2016, and Duane Seabolt, Debtors' expert witness; TDH

---

[3] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, all "Civil Rule" references are to the Federal Rules of Civil Procedure, and all "HRS" references are to the Hawaii Revised Statutes.

[4] Without objection, TDH offered evidence at trial on the issue of reasonably equivalent value, so the bankruptcy court considered the issue again in its post-trial decision. TDH does not specifically argue the issue of reasonably equivalent value on appeal. It contests only the bankruptcy court's findings as to Debtors' insolvency and TDH's good faith.

submitted direct testimony declarations from Xiaodong Yang, an employee of the managing partner of TDH, and Garret Hoe, TDH's expert witness. All four witnesses also testified at the three-day trial. In addition, TDH offered a deposition transcript for adverse witness Du Sha. Numerous exhibits were offered by the parties.

Chang testified extensively as to Debtors' finances and financial record around the time of the 2019 Transaction. He testified that in 2019 and 2020, Debtors did not generate cash flow sufficient to pay their debts. Historically, PLUSH received equity infusions to fund operating shortfalls of the subsidiary Debtors. Chang testified that by 2019, the annual shortfall for the development of the Makaha Project was between $5 and $7 million.

Chang testified as to the general process of the subsidiary Debtors' request and receipt of equity infusions. A monthly 90-day forecast was prepared. Debtors' CEO, Rudy Anderson, would then submit the 90-day forecasts to Vivien Zhang, CFO of the Pacific Links entities in Asia. Debtors would receive some or all of the requested funding over the 90-day period from deposits into a PLUSH bank account, or indirectly by payments made by nondebtor Pacific Links US Services, Inc. on Debtors' debts. The 90-day forecasts from October, November, and December 4 and 9, 2019, projected significant revenue shortfalls ($2 million, $1.3 million, $4.12 million and $3.65 million, respectively) and Debtors understood through discussions with Zhang that equity infusions would not be made in amounts sufficient to cover the shortfalls and, eventually, would cease altogether.

Chang testified that the Makaha Project lacked capital as early as the third or fourth quarters of 2019. And around the third or fourth quarter of 2019, it was decided that development of the Makaha Project would be halted due to lack of sufficient cash flow. The decision to halt the development of the Makaha Project was communicated by email to the project manager, Stanford Carr, in or about December 2019 and confirmed in January 2020.

Chang testified that, as of October 2019, he understood that Debtors were having difficulty obtaining capital from the Pacific Links entities in Asia to fund development of the Makaha Project or Debtors' ongoing business. Chang also testified that a realtor was hired in October 2019 to sell the Makaha Property for a list price of $35 million, which is what Debtors collectively paid for the parcels and what their tax assessed value was at the time. Chang acknowledged that the sales marketing materials provided that Debtors desired a joint venture partner as opposed to an outright sale, but he said that an outright sale was sought from the start and no joint venture partners materialized.

Chang testified that, in December 2019, Debtors were adjusting the budgeting of development costs by deferring various expenses into the future due to lack of sufficient capital. For example, a payment of $1 million was due to a Makaha Project designer on December 1, 2019, but Debtors lacked sufficient funds to make the payment. The designer agreed to accept $500,000 payable immediately and $500,000 on January 15, 2020. The first $500,000 was paid, but the second $500,000 was never paid.

Chang testified that the 2019 Transaction left Debtors in a much worse financial position than before. Even though prior to the 2019 Transaction Debtors may have had difficulty borrowing through traditional lending institutions due to lack of cash flow, they now had excessive liability and no unencumbered assets to offer as collateral for loans from asset-based lenders, despite having previously had significant equity in the subsidiary Debtors' real properties.

As to the cessation of development, Chang testified that certain development expenditures were paid in January 2020, but payment of additional development expenses effectively stopped in February 2020. Also, in February 2020, management employees had to take a 50% pay reduction. Debtors did not sell any residential lots or golf memberships at the Makaha Property after the 2019 Transaction.

Seabolt testified to the contents of his report and conclusion that Debtors were insolvent under all three insolvency tests. He further testified that the addition of a $57 million obligation severely hindered Debtors' ability to obtain additional borrowed or equity capital from third parties.

Yang testified that TDH had loaned funds to TKB (and the related Pacific Links entities) for years and that he was familiar with their loan transactions. Yang testified that he was aware of Du Sha's request in 2019 to extend the 2017 and 2018 loans because of a cash shortage. Yang testified that, as part of TDH's due diligence for the 2019 Transaction, TDH had a three-person team investigate the Pacific Links entities' financial situation and

8

TKB's use of the 2017 and 2018 loan proceeds. During that investigation, TDH learned that, between 2017 and the first half of 2019, RMB 130 million (about $21 million) was transferred outside of China to support Pacific Links' North American entities, the majority of which was used to pay other loans and development expenses for the Makaha Project. Yang testified that TDH entered into the 2019 Transaction with the understanding that Debtors had benefitted from the prior loans and that Debtors would benefit from the 2019 Transaction as well, because it would free up funds for Debtors' continued operations and development of the Makaha Property.

Yang testified that TDH was provided with various due diligence materials, including Du Sha's personal information, Debtors' organizational structure, business model, and balance sheets, along with development plans and spending forecasts for the Makaha Project. Yang testified that the financial statements provided showed that Debtors' assets exceeded their liabilities and, while TKB was expected to pay the debt in full, Debtors' assets were more than enough to cover their share if TKB could not perform. Yang testified that the financial statements further showed that TKB's projected sales proceeds and profits for 2020-2022 would be substantial. Yang testified that Du Sha had represented to TDH that the Pacific Links entities in Asia, including TKB, were very successful and that sales revenues were expected to increase year after year. Yang testified that, in agreeing to enter into the 2019 Transaction, TDH relied in good faith on the representations made by TKB, Debtors, and Du Sha.

**E.     The bankruptcy court's ruling**

The bankruptcy court determined that Debtors' obligations and transfers under the 2019 Transaction were constructively fraudulent and thereby avoidable under § 548(a)(1)(B) and HRS § 651C-4(a)(2). While the court found that Debtors had failed to establish they were balance-sheet insolvent after the 2019 Transaction, the court found that Debtors were engaged in a business or were about to engage in a business for which their remaining property was an unreasonably small capital, and that Debtors intended to incur, and believed they would incur, debts they could not pay when due.

The court further found that TDH had not established a good faith defense because TDH knew, or should have known, that Debtors were in financial distress at the time of the 2019 Transaction, and that the obligations Debtors undertook and the transfers they made would make their financial difficulties substantially worse. This timely appeal followed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(H). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1.     Did the bankruptcy court clearly err in finding that Debtors were insolvent under both the adequate capital test and the cash flow test?

2.     Did the bankruptcy court clearly err in finding that TDH failed to meet its burden to prove that it took the transfers in good faith?

## STANDARDS OF REVIEW

With respect to a bankruptcy court's decision on fraudulent transfer claims, we review its factual findings for clear error and its conclusions of law de novo. *Decker v. Tramiel (In re JTS Corp.),* 617 F.3d 1102, 1109 (9th Cir. 2010).

A bankruptcy court's factual findings are not clearly erroneous unless they are illogical, implausible or without support in the record. *Retz v. Samson (In re Retz),* 606 F.3d 1189, 1196 (9th Cir. 2010). If two views of the evidence are possible, the court's choice between them cannot be clearly erroneous. *Anderson v. City of Bessemer City,* 470 U.S. 564, 574 (1985). When factual findings are based on credibility determinations, we must give even greater deference to the bankruptcy court's findings. *Id*. at 575.

"De novo review requires that we consider a matter anew, as if no decision had been made previously." *Francis v. Wallace (In re Francis),* 505 B.R. 914, 917 (9th Cir. BAP 2014).

We may affirm on any basis supported by the record. *Shanks v. Dressel,* 540 F.3d 1082, 1086 (9th Cir. 2008).

## DISCUSSION

**A.    The bankruptcy court did not clearly err in finding that Debtors were insolvent under the adequate capital and cash flow tests.**

A debtor in possession may bring an action to avoid a prepetition transfer that is alleged to be constructively fraudulent under § 548(a)(1)(B) or applicable state law as provided in § 544(b)(1). *See* § 1107(a). To avoid the transfers to TDH, Debtors had to show: (1) there were transfers of Debtors'

property; (2) the transfers were made within two years of the bankruptcy filing; (3) Debtors received less than reasonably equivalent value in exchange for the transfers; and (4) Debtors were insolvent, made insolvent by the transfers, operating or about to operate without sufficient capital, or unable to pay debts as they become due. *Hasse v. Rainsdon (In re Pringle)*, 495 B.R. 447, 462-63 (9th Cir. BAP 2013); § 548(a)(1)(B)(i)-(ii)(I)-(III).[5]

On appeal, TDH challenges only the fourth element. Specifically, TDH challenges the bankruptcy court's findings that Debtors had established insolvency under the adequate capital test and the cash flow test. TDH also challenges the bankruptcy court's finding that TDH did not establish a good faith defense under § 548(c).

### 1. Adequate Capital Test

Under this test, also known as the "unreasonably small capital" test, Debtors had to prove that at the time of the transfers they were engaged in or about to engage in business that would leave them with an unreasonably small capital. § 548(a)(1)(B)(ii)(II). This test denotes a financial condition short of equitable or "cash flow" insolvency. *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992); *AWTR Liquidation Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*, 548 B.R. 300, 312-13 (Bankr. C.D. Cal. 2016). It is "aimed at transferees that leave the transferor technically solvent but doomed

---

[5] Hawaii law is substantially similar. *See* HRS § 651C-4(a)(2). However, since the transfers at issue were within two years of the bankruptcy filing, neither Debtors nor the bankruptcy court needed to rely on Hawaii law to grant relief. Accordingly, we review the court's decision under federal law only.

to fail." *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) (citing *Moody*, 971 F.2d at 1070 & n.22).

In determining unreasonably small capital, courts generally examine cash flow to determine whether it was reasonably foreseeable that the transfer at issue would lead to the debtor's "inability to generate enough cash flow to sustain operations." *Moody*, 971 F.2d at 1070. In a business setting, the aggregate amount of capital "should include . . . all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period." *Id.* at 1072 n.24 (quoting Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital*, 21 Ind. L. Rev. 469, 496 (1988) (citing cases)).

The bankruptcy court found that, before the 2019 Transaction, Debtors were operating at a shortfall with a very small chance of obtaining sufficient equity either from their operations, equity infusions from affiliates, potential sales, or possible loans for their continuing business operations. The court found that equity infusions or loans were the only realistic sources of funding. As for equity infusions, the court found credible Chang's testimony that Zhang informed him in either the 3rd or 4th Quarter of 2019 that the equity infusions to Debtors were declining and, just after the 2019 Transaction, were stopping altogether. As for any loans, before the 2019 Transaction Debtors' assets were worth substantially more than their debts. While Debtors might have been able to obtain loans based on this equity, the

court found that the chances were small because they had almost no cash flow with which to service any new debt. The 2019 Transaction added $57 million secured debt to Debtors' balance sheets, which the court found eliminated most, if not all, of Debtors' equity in the properties and extinguished any faint hope they might have had of obtaining new financing to fund their operational and development needs. The court concluded that the cessation of equity infusions along with the fact that Debtors' assets were fully encumbered by the mortgages satisfied the adequate capital test.

TDH argues that the bankruptcy court erred in finding that, prior to the 2019 Transaction, equity infusions were declining and that Debtors no longer anticipated any future equity infusions. TDH contends the bankruptcy court disregarded the weight of the evidence, which according to TDH, indicated that on December 11, 2019 – the closing date for the 2019 Transaction – Debtors had no reason to anticipate that equity infusions in amounts sufficient to meet their operating shortfalls, consistent with historic practice, would end. TDH asserts that Chang's testimony was too vague; he could not pinpoint when he was told the equity infusions would cease, only that it was in the 3rd or 4th Quarter of 2019, and his hearsay[6] testimony was not supported by any documents or other evidence. TDH argues, the only reasonable inference that can be drawn from Chang's testimony, when

---

[6] Before trial, TDH raised a hearsay objection to Chang's declaratory testimony as to what Zhang told him about the timing of the cessation of the equity infusions. However, TDH solicited this same testimony from Chang on cross-examination at trial. Therefore, its argument that the bankruptcy court erred in admitting this testimony is not well-taken.

considered with the totality of the evidence, was that discussions concerning both halting development and withholding future equity infusions happened after December 11, 2019. Therefore, argues TDH, neither it nor Debtors knew or could have known these facts before that date.

TDH's arguments are essentially an improper invitation for us to reweigh the evidence, and they also ignore the key findings on which the bankruptcy court based its determination that Debtors were insolvent under the adequate capital test. Chang and Seabolt both testified that only one of the subsidiary Debtors, MVCC, generated any operating income, and it was insufficient to cover its own operating expenses let alone the operating expenses of the other Debtors or any development expenses. Chang and Seabolt both testified that Debtors' operations relied entirely upon the equity infusions from affiliates. Chang testified as to Debtors' projected operating shortfalls for October, November, and December 2019. Chang also testified that, according to Zhang, future inflows from affiliates were coming to a stop beginning in the 4th Quarter of 2019. Given that timeframe, it is more likely than not that the equity infusions would stop before December 11, 2019.

In addition, an email communication dated October 17, 2019, between CEO Anderson and management, including Chang, revealed that at the time there were significant political pressures in China to control the flow of funds to offshore investments such that Debtors anticipated difficulty in receiving future equity infusions from affiliates. The lack of future equity infusions is what informed Debtors' decision to halt development and engage a realtor in

15

October 2019 to assist with the Makaha Property, by either obtaining joint venture partners or selling.

We perceive no clear error in the bankruptcy court's finding that the equity infusions began to decline before the 2019 Transaction and ceased soon thereafter. Its analysis of the evidence was plausible and supported by inferences that may be drawn from the facts in the record. While the record may contain facts supportive of alternate inferences, the bankruptcy court was in the best position to evaluate the documentary and testimonial evidence. In addition, the 2019 Transaction encumbered all of the subsidiary Debtors' assets, making it impossible for them to obtain any other loans to sustain operations. Accordingly, it was not error for the bankruptcy court to conclude that, at the time of the 2019 Transaction, Debtors were engaged in or about to engage in a business for which they had unreasonably small capital.

**2.    Cash Flow Test**

Under the "cash flow" or "equitable" insolvency test, Debtors had to prove that at the time of the transfers they intended to incur or believed that they would incur debts beyond their ability to pay as they came due. § 548(a)(1)(B)(ii)(III). This prong is satisfied "if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured." *WRT Creditors Liquidation Tr. v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 415 (Bankr. W.D. La. 2001); *see EBC I., Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 359 (Bankr. D.

16

Del. 2008), *aff'd*, 400 B.R. 13 (D. Del. 2009), *aff'd*, 382 F. App'x 135 (3d Cir. 2010) (same). "While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured." 5 COLLIER ON BANKRUPTCY ¶ 548.05[3][c] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed., 2012) (citing cases).

TDH argues that the bankruptcy court erred in concluding that Debtors intended to incur or believed they would incur debts beyond their ability to pay as they became due. TDH contends that the court erred in its evaluation of whether Debtors intended to incur debts beyond their ability to pay by focusing solely on Debtors' obligations – property taxes and the promissory notes – and not considering that Debtors still anticipated the equity infusions to meet those obligations at the time of the 2019 Transaction.

The bankruptcy court's findings pertaining to the cash flow test generally hinged on the same findings it made in concluding that Debtors were insolvent under the adequate capital test. The court found that, due to the lack of equity infusions, when Debtors entered into the 2019 Transaction they intended to incur and believed they would incur debts that they could not pay when due. For the same reasons we concluded that the court's findings that Debtors were insolvent under the adequate capital test were not clearly erroneous, we similarly conclude that its insolvency findings with respect to the cash flow test were not clearly erroneous.

17

TDH also challenges what it calls the court's "equitable magnitude finding." TDH maintains the court erred in finding that Debtors would have had to anticipate $57 million in new equity or lot sales within a year (the expiration of the extended loan) to prevent Debtors' insolvency rather than the smaller amounts sufficient to pay operational costs. Besides the court's erroneous assertion that the loan was extended for only one year when it was actually three years (with an additional extension option of one year), the court's statement which TDH is referring to here was not related to its findings as to Debtors' insolvency. Rather, this "cherry-picked" statement went to the court's finding that Debtors did not receive reasonably equivalent value for the obligations and transfers they made under the 2019 Transaction, which TDH has not challenged on appeal.

**B.      The bankruptcy court did not err in finding that TDH failed to meet its burden to prove that it took the transfers in good faith.**

Section 548 permits a good faith transferee to retain funds fraudulently transferred to the extent that the transferee gave value to the debtor in exchange for the transfer. § 548(c). The good faith standard here features an objective component. Courts look to what the "transferee objectively knew or should have known . . . rather than examining what the transferee actually knew from a subjective standpoint." *Hayes v. Palm Seedlings Partners-A (In re Agric. Rsch. & Tech. Grp., Inc.)*, 916 F.2d 528, 536 (9th Cir. 1990) (cleaned up). "In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible

18

insolvency." *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995) (citations omitted); *see also Gill v. Maddalena (In re Maddalena)*, 176 B.R. 551, 556 (Bankr. C.D. Cal. 1995) (reasoning that "a transferee's knowledge of, or a reasonable cause to suspect, the transferor's insolvency may be inconsistent with good faith"). The burden of proof for the good faith defense is on the transferee. *In re Agric. Rsch. & Tech. Grp., Inc.*, 916 F.2d at 535.

TDH argues that the bankruptcy court erred in finding that it knew or should have known that Debtors were in financial distress and that the 2019 Transaction would make their financial condition much worse. TDH contends the record contained insufficient evidence to establish that it knew or should have known of Debtors' insolvency. To the contrary, argues TDH, the evidence showed that Du Sha painted a rosy picture of his companies' prospects, and he represented that his companies, including Debtors, had a bright future. Du Sha also testified that, but for COVID, the loans could have been repaid, and there was no evidence that TDH knew about the internal discussions among Debtors regarding their diminishing equity infusions. TDH also argues that it did not rely solely on Du Sha's representations as the bankruptcy court stated; TDH also relied on financial information provided by the Pacific Links entities, and Debtors' public statements during the due diligence period about the continued viability of the development of the Makaha Property.

Although the bankruptcy court did not explicitly identify the basis for inferring knowledge of Debtors' financial distress to TDH, we conclude that

19

the record supports that TDH was on inquiry notice of Debtors' insolvency.

As Debtors note, TDH was aware of their financial distress or, at the very least, on inquiry notice of it having done its due diligence which showed that: (1) MVCC operated at a loss, and the other subsidiary Debtors did not generate income but had expenses; (2) Debtors relied on equity infusions to pay expenses; (3) the Pacific Links entities had financial setbacks around the time of the 2019 Transaction; (4) Du Sha requested an extension of the 2017 and 2018 loans because there was not enough cash to pay them back on time; (5) Debtors' assets would be dwarfed by the new debt; (6) mortgages would prevent Debtors from accessing their equity to pay expenses; (7) no new funding came directly from the 2019 Transaction; (8) Debtors were becoming obligated on multi-million dollar debt with no direct benefit and nominal, if any, indirect benefit; (9) the 2019 Transaction was not arms-length; and (10) TDH used its relationship with TKB to unduly influence Debtors to sign the guarantees and mortgages.

Given the record, we conclude that the bankruptcy court did not clearly err in finding that TDH knew or should have known that Debtors were in financial distress at the time of the 2019 Transaction, and that TDH failed to meet its burden of proof that it took the transfers in good faith. While TDH may not have known that the equity infusions were going to stop, it knew that Debtors were not obligors under the 2017 and 2018 loans and that they did not receive any proceeds or property from the 2019 Transaction, but were now obligated to pay those prior loans. TDH also knew that Debtors had

20

essentially no income from operations and that they were fully encumbering their assets with the 2019 Transaction.[7] These are hallmarks of an avoidable transfer. Because good faith was lacking, we need not reach the issue of whether TDH gave value in exchange for the transfers.[8]

## CONCLUSION

For the reasons stated above, we AFFIRM.

---

[7] TDH certainly knew of Debtors' financial distress when it recorded the mortgages months later in March and April 2020, after TKB had already defaulted on the loan payments and triggered Debtors' obligation to pay.

[8] TDH argues that we must remand because the bankruptcy court failed to make sufficient findings of fact and conclusions of law in accordance with Civil Rule 52(a), applicable here by Rule 7052. We do not believe that remand is necessary. The findings and conclusions the court made are not so inadequate that we are left without a complete understanding of the issues, and we can discern from the record the basis of its decision. *See Louie v. United States*, 776 F.2d 819, 823 (9th Cir. 1985).